[S. F. No. 15685. In Bank.—November 25, 1936.]

CLAUDE C. GILLUM, Petitioner, v. CHARLES G. JOHN-SON, State Treasurer, etc., et al., Respondents.

748

Hugh K. McKevitt and Charles W. Fisher for Petitioner.

Athearn, Chandler & Farmer, Cullinan, Hickey & Sweigert and John C. Wood as *Amici Curiae* on Behalf of Petitioner.

U. S. Webb, Attorney-General, John J. Dailey, Deputy Attorney-General, and John L. McNabb, Special Counsel for Unemployment Reserves Commission, for Respondents.

Allen G. Wright as *Amicus Curiae* on Behalf of Respondents.

SHENK, J.—This is a proceeding in *mandamus* to compel the respondents, in so far as their official duties may be involved, to comply fully with the State Unemployment Reserves Act (Stats. 1935, p. 1226), and with the Federal Social Security Act (49 Stats. at Large, 620).

The petitioner is the proprietor of the Hotel Claremont in the county of Alameda. As such, he is the employer of eight or more persons in the state of California. In accordance with the state act he forwarded to the Unemployment Reserves Commission of this state nine-tenths of one per cent of the wages paid to his employees, and forty-five hundreths of one per cent deducted from the wages of his employees during the same period, said sums representing the tax on the employer and the employee under the state act. The petitioner alleges that the respondent commission received the moneys but refuses to pay the same to the state treasurer as required by the state act, notwithstanding the

demand of the respondent state controller that it do so; that the respondent controller has notified the petitioner that even if said funds be paid to the State Treasurer he (the controller) will refuse to audit and draw warrants for the amounts for deposit as required by the federal act.

. The state act was approved by the Governor on June 25, 1935, and is entitled: "An act to establish a system of unemployment reserves for this state, and making an appropriation therefor." Section 1 sets forth the basis of and reasons for the enactment of the statute, viz., that experience has shown that large numbers of the population of California do not enjoy permanent employment by reason of which their purchasing power is unstable, and which is detrimental to the interests of the people of the state as a whole; that the benefit to all persons resulting from public and private enterprise is realized in the final consumption of goods and services; that it is contrary to public policy to permit the supply of consumption goods and services at prices which do not provide against that harm to the population consequent upon periods of unemployment of those who contribute to the production of such goods and services; that experience has shown that private charity and local relief cannot alone prevent the effects of unemployment and that if the state awaits the coming of excessive unemployment it can neither create . immediately the organization necessary to orderly, economical and effective relief, nor bear the burden of relief without disrupting its whole system of ordinary revenues and without jeopardizing its credit; that in order to meet in some measure the situation shown to be created by excessive unemployment, this act is designed to accumulate a reserve to assist in protecting the public against the social effects of unemployment which may be created in future years.

Section 2 provides that the statute is enacted as a part of a national plan of unemployment reserves and social security, and for the purpose of assisting in the stabilization of unemployment conditions; that the imposition of the tax provided by the act upon California industry alone, without a corresponding tax be imposed upon all industry in the United States would, by the corresponding penalty upon California industry, defeat the very purposes of the act; that "therefore this act shall take effect only if and when there is enacted legislation by the United States Government provid-

·ing for a tax upon the payment of wages by employers in this state, against which all or any part of the contributions required by this act may be credited''; that whenever the legislation enacted by the United States government is repealed, amended, affected, or otherwise changed in such manner that the contributions required by the act or some portion thereof cannot be thus credited, then upon the date of such change the provisions of the act requiring contributions and providing for payment of benefits shall cease to be operative and any assets in the unemployment ·fund or unemployment administration fund shall in the discretion of the State Treasurer be held in the then existing depositaries or otherwise in the state treasury; that in the case of the unemployment administration fund, such moneys may thereafter be dealt with by the State Treasurer pursuant to the conditions of the grant thereof to the state by the United States government or agency thereof.

The state act is administered by the Unemployment Reserves Commission of five members, appointed by the Governor, by and through the· state department of employment also created by the act, of which department the commission is the governing body. Two major funds are created, the ''Unemployment Fund'' and the ''Unemployment Administration Fund''.

The unemployment fund consists of all contributions and moneys paid into and received by the fund as provided in the act and of property and ·securities acquired by and through the use of moneys belonging to the fund, and of interest earned upon the moneys belonging to the fund.

The unemployment administration fund consists of all moneys received by the state or by the commission for the administration of the act. This fund shall be in the state treasury and shall be handled as other state moneys are handled, except that it shall be expended solely for the purposes of the administration of the act and except also that any balances therein shall not lapse at any time but shall remain continuously available to the commission for appropriate expenditures. All federal moneys allotted or apportioned to the state by the federal social security board or other agency for the administration of the state act are to be paid into the unemployment administration fund.

The obvious distinction between these two funds is that the unemployment fund and its earnings are to be used solely for the payment of benefits provided in the act and this fund is not subject to diminution for administration purposes; whereas the unemployment administration fund is intended to be used for purposes other than the payment of benefits and contributions to that fund consisting of allocations from the federal government, presumably at least in part from the ten per cent of the federal excise tax which is not credited on contributions under the state act, and moneys received otherwise than in the exaction of the tax, state or federal.

The state act requires contributions from the employers subject thereto of nine-tenths of one per cent of their payrolls in 1936, one and eight-tenths per cent in 1937, and two and seven-tenths per cent in 1939 and thereafter. The employees subject to the act are required to contribute from their wages one-half of one per cent in 1936, and one per cent beginning January 1, 1937, and thereafter. The employer is required to deduct the employee's contribution from his wages and transmit both to the unemployment fund. The state commission is authorized to exempt from the payment of contributions certain employers who adopt an approved guaranteed employment plan or an approved private unemployment benefit plan.

The following types of employment are not included in the taxable payrolls: (1) Employees who did not perform the greater part of their work in this state; (2) agricultural labor; (3) domestic service in a private home; (4) service performed as an officer or member of the crew on a vessel on the navigable waters of the United States; (5) service performed by parents, minor children or spouses of employers; (6) service by government employees; (7) service for certain nonprofit organizations; and (8) service for which an unemployment compensation system is established by the United States.

An eligible employee is defined as every person employed by an employer subject to the provisions of the act in an employment subject to the act. An employer is defined as every individual, trust or estate, partnership, association, joint-stock company or corporation, subject to a payroll tax levied by the United States government, if the tax levied by

the state act, or any portion thereof, may be credited against such payroll tax.

The term "benefits" is defined to mean the money allowance payable to an employee as compensation for his wage losses due to unemployment as provided in the act. The term "total unemployment" is defined to mean the condition caused by the inability of an employee, who is capable of and available for work, to obtain suitable employment when such condition causes total loss of wages. Partial unemployment means any temporary reduction in working hours below the normal working hours per week, and which results in loss of wages. Normal working hours are then defined.

The act defines "suitable employment" as employment in the employee's usual employment or employment for which the employee is reasonably fitted, but is not suitable (1) if vacancy in it is created by strike, lockout or other labor dispute; (2) if the wages, hours or other conditions of the work offered are substantially less favorable to the individual than those prevailing for similar work in the locality; and as a condition of such employment the individual will not be required to join a company union or to resign from or refrain from joining any *bona fide* labor organization.

An employee is not eligible for benefits for either total or partial unemployment, (1) if he fail to give notification of unemployment, as provided in the act, or unless such notification is waived by the commission; (2) if he is physically unable to work or not available for work when called upon by his employer or by the district public employment office; and (3) if he has suitable employment.

An employee is not eligible for benefits for total unemployment based on past weeks of employment, (1) if he left his employment because of a trade dispute and continues out of employment by reason of the fact that the trade dispute is still in active progress in the establishment in which he was employed; (2) if he attended school or college during the last preceding session thereof and has been employed by his employer only during the customary vacation period; (3) if without good cause he has refused to accept suitable employment when offered to him, or failed to apply for suitable employment when notified by the district public employment office; (4) if he has not been a resident of this state for one year immediately preceding the beginning of unemployment

or has not been gainfully employed in the state for twenty-six weeks within such one-year period, with an exception not necessary to note. Benefits become payable after January 1, 1938, for unemployment occurring after that date. For total unemployment the rate of benefits is fifty per cent of the average weekly wage but not exceeding fifteen dollars nor less than seven dollars per week; for partial unemployment the difference lost to the employee between the eligible employee's actual wages for the week and the weekly benefits to which he would be entitled if totally unemployed.

The foregoing is not a complete *résumé* of the state act but it is set forth sufficiently in outline to note its general scope and effect.

The purpose of the Federal Social Security Act is expressed in the title: "An act to provide for the general welfare by establishing a system of federal old age benefits and by enabling the several states to make more adequate provision for aged persons, blind persons, dependent and crippled children, maternal and child welfare, public health, and the administration of their unemployment compensation laws; to establish a social security board; to raise revenue; and for other purposes."

We are here concerned only with those provisions of the act which relate to unemployment compensation—called unemployment insurance in the state act. Briefly in this respect the federal act imposes on employers an excise tax of one per cent of wages paid by them in 1936, two per cent of wages in 1937, and three per cent of wages paid in 1938 and thereafter, in respect to employment in the United States, including Alaska and Hawaii. With certain exceptions the federal tax is collected from each employer who has eight or more persons in his employ on any one day in each of twenty different weeks during the calendar year. The payroll for 1936 will determine who is liable and also the amount of the tax that will be payable in January, 1937.

If a state has no unemployment insurance law meeting the standards set up by the federal act the full amount of the federal tax, without any deduction, is paid into the general fund of the United States treasury in like manner as ordinary internal revenues. If a state has such a law and the same has been approved by the federal social security board, employers subject to the state tax may deduct

from the federal tax ninety per cent of their contributions made to the state for the taxable year, provided such state contributions have been paid prior to the filing of their federal returns. The act sets up in the federal treasury a fund called the "Unemployment Trust Fund". All contributions made by employers and employees under the state act and paid into the state "unemployment fund" are required to be deposited in the unemployment trust fund and are thereafter subject to requisition by the state commission as to the full amount thereof for the payment by the state commission of benefits for unemployment relief within the state. The Secretary of the Treasury is authorized to invest the moneys in the unemployment trust fund, but only in interest-bearing obligations of the United States or in obligations guaranteed as to both principal and interest by the United States. In making such investments the unemployment trust fund is treated as a single fund, but a separate bank account is kept showing the amount of deposits from each state and this account is credited, from time to time, with the proportionate earnings from investments so made by the Secretary of the Treasury.

Under the provisions of title III of the federal act an appropriation of $4,000,000 is authorized for the fiscal year ending June 30, 1936, and the further sum of $49,000,000 each year thereafter, for the purpose of assisting the states in the administration of their unemployment compensation laws. These funds are certified by the social security board for payment to each state having an approved unemployment compensation law on the basis (1) of the population of the state; (2) of the estimated number of persons covered by the state law and of the cost of administration of such law; and (3) of such other factors as the board finds relevant.

The provisions of titles III and IX of the federal act make it plain that the purpose of the federal legislation was to encourage and bring about a uniform system of unemployment compensation throughout the United States. Those provisions are held out as an inducement to the states to enact unemployment compensation laws in accordance with certain general standards provided in the federal law, but leaving the actual operation of unemployment insurance and generally the numerous details in connection

therewith, including the payment of benefits, to the states under their own laws.

The legislature of this state anticipated the enactment of the federal statute and passed the state act (approved June 25, 1935), before the effective date of the federal law (August 14, 1935). The federal bill was in the process of enactment but had not become law when our legislature was considering the enactment of the state law on the subject. The legislature took notice of the terms of the pending bill, generally, and caused the state law to conform to the requirements of the federal law if the same should be enacted. Soon after the state law went into effect the provisions thereof were approved by the social security board.

The purpose of the present proceeding is threefold. First, to compel the respondent Unemployment Reserves Commission created by the state act to pay into the state treasury to the credit of the unemployment fund the moneys which it has received from the petitioner pursuant to the terms of the act; secondly, to compel the respondent State Treasurer when he receives said funds, to deposit the same to the credit of the unemployment trust fund in the federal treasury; and thirdly, to compel the respondent State Controller to draw his warrant for the sums to be so deposited.

As to the respondent commission, there can be no doubt of its duty to pay over to the State Treasurer the contributions which it has received from employers pursuant to the requirements of the state act. The commission acknowledges and asserts the validity of the federal-state plan of unemployment insurance as provided for in the two enactments and has raised no tenable point with reference to the regularity of the payment to it by the petitioner. Article 3 of the state act plainly contemplates that the State Treasurer shall be the custodian of the unemployment fund; that contributions thereto made by employers should be paid into that fund without delay, and that the commission shall file an account with the department of finance and the State Controller not later than the close of each month. There is no authority in law for the commission to retain this money and the peremptory writ should issue requiring its payment to the credit of the unemployment fund in the state treasury. Even if the law under which the payments were made

to it be ultimately ineffective, there is no authority for the commission to retain them indefinitely.

The respondent treasurer makes no point that it is not his duty to deposit the moneys paid into the unemployment fund to the credit of the unemployment trust fund in the federal treasury, if such deposit is constitutionally authorized.

The respondent controller has assumed an attitude which requires a consideration of the challenged provisions of the state act and also of the effect of the federal statute. He submits a return through the attorney-general consisting of a general demurrer to the petition alleging that the state act is in violation of numerous provisions of the state Constitution, particularly section 16½ of article XI, section 22 of article IV, section 21 of article I, and subdivision 19 of section 25 of article IV. *Amici curiae* in support of the controller's position present the same points and in addition argue that the federal act is unconstitutional.

It is first insisted that to require the transfer of moneys in the state unemployment fund to the Secretary of the Treasury to the credit of the federal unemployment trust fund would be contrary to the provisions of section 16½ of article XI of the state Constitution. That section provides: "All moneys belonging to, or in the custody of, the state, or any county, city and county, city, town, municipality, or other public or municipal corporation, within this state, may be deposited in any national bank or banks within this state, or in any bank or banks organized under the laws of this state, in such manner and under such conditions as may be provided by any law adopted by the people under the initiative or by two-thirds vote of each house of the legislature and approved by the governor and subject to the referendum; provided that the laws now governing the deposit of such moneys shall continue in force until such laws shall be amended, changed or repealed as in this section authorized; and provided further that the state or any county, city and county, town, municipality or other public or municipal corporation, issuing bonds under the laws of this state, may deposit moneys in any bank or banks outside this state for the payment of principal or interest of such bonds at the place or places at which the same are payable."

Section 903 of the federal act requires that all moneys received in the state unemployment fund shall immediately upon such receipt be paid over to the Secretary of the Treasury to the credit of the "unemployment trust fund" established by section 904. The section last mentioned sets up that fund in the treasury of the United States and further provides: "The secretary of the treasury is authorized and directed to receive and hold in the fund all moneys deposited therein by a state agency from a state unemployment fund. Such deposit may be made directly with the secretary of the treasury or with any federal reserve bank or member bank of the federal reserve system designated by him for such purpose."

Section 22 of the state act provides that all contributions paid under the state act shall upon collection be deposited in or invested in the obligations of the "unemployment trust fund" of the United States government or its authorized agent so long as said trust fund exists, notwithstanding any other statutory provision to the contrary, and that the commission shall requisition from the unemployment trust fund necessary amounts from time to time. Under section 24 of the state act the State Treasurer is the custodian of the unemployment fund and the unemployment administration fund except when moneys in the unemployment fund are in the federal unemployment trust fund.

It is readily observed that if the language of the federal act were to be so construed as to require without condition that the money in the state unemployment fund be deposited in the treasury of the United States, or in any bank outside of the state, such requirement would be in violation of the provisions of the state Constitution. But the federal act provides the means by which such violation may be avoided, namely, by deposit in a national bank in this state designated by the Secretary of the Treasury for that purpose. Since the state act has been approved by the proper federal authority, it must be assumed that such approval carried with it an approval of the state act as it could constitutionally operate in this state and that some national bank or banks in this state would be designated for deposit of the state unemployment funds. When a federal reserve or a member bank within this state is so designated and the unemployment fund is deposited therein by the respondent

treasurer there is no violation of the section of the state Constitution referred to. ■ It must be conceded that the moneys so contributed under the act are not public moneys in the sense that they are subject to appropriation other than as provided in the act. The funds thus raised are in their nature a continuing appropriation for a specific purpose. (See *Daugherty* v. *Riley*, 1 Cal. (2d) 298 [34 Pac. (2d) 1005].) The balances therein do not revert to the general fund at the end of the fiscal year and under both the state and federal acts constitute trust funds to be administered by the state commission and subject to its call at all times. ■ Although these funds are required to be deposited in a federal reserve or member bank in this state, the federal government does not obtain title to the money but holds it in trust for the beneficiary—the state commission, which in turn is bound to administer it by the payment of benefits without diminution for administration purposes. The fact that these funds must be deposited with a national bank should not destroy their character as a deposit as contemplated by the state Constitution. Being moneys "in the custody" of the state they are subject to such deposit within the law.

■ It is next contended that such deposit is nevertheless contrary to the provisions of section 22 of article IV of the Constitution which provides in part: "No money shall be drawn from the treasury but in consequence of an appropriation made by law, and upon warrants duly drawn thereon by the controller." As above stated the provisions of the state act constitute a continuing appropriation of the unemployment fund for the specific purpose for which its accumulations are to be used, and section 93 of the state act specially provides that all moneys made available by or received by the state under the federal act shall be paid into the special unemployment service account in the unemployment administration fund, "and all such moneys are hereby appropriated without regard to fiscal year and shall be expended in accordance with law". It thus appears that all moneys received by the state commission are set apart as a continuing appropriation for the purposes specified and the provisions of the Constitution with reference to appropriations are therefore satisfied.

■ The additional requirement of section 22 of article IV of the state Constitution that all money in the state treasury, however appropriated, shall be drawn "upon warrants duly drawn thereon by the controller" is mandatory. The legislature may not disregard it and all parties dealing with money in the state treasury are bound by it. No good reason has been advanced why compliance with it should not be observed or why such compliance would unduly burden the operation of the statutory plan.

■ The question raised under section 21 of article I and subdivision 19 of section 25 of article IV is whether the classification of persons subject to the state tax is such a classification as the legislature is empowered to make. The employers so classified are those who are subject to the payroll tax imposed by the federal government, namely, employers having eight or more employees, with employees in certain lines of employment exempted. Obviously the charge that the whole plan of federal-state unemployment insurance as outlined in the two statutes is unworkable would seem to have more merit if it were made to apply to employers of every sort without regard to the nature of the employment or the number of employees. The difficulties of enforcement and administration might thus be so greatly multiplied as to destroy the plan entirely. It is well established that the matter of classification is primarily one for legislative determination and no argument has been advanced which would compel the conclusion that in its taxing features the classifications laid down are so arbitrary or unreasonable as to require judicial condemnation. This conclusion must especially apply to classifications under the state act, namely, those engaged in employment where the industry or business engages eight or more employees. It was deemed necessary to draw the line somewhere in order that the plan be not too cumbersome and unwieldy. Similar classifications for purposes of administration have been properly made in section 8 of our workmen's compensation law. ■ Whether the benefit paying feature of the pooled fund plan of our state law will meet the tests laid down in the Railroad Retirement Act case (*Railroad Retirement Board* v. *Alton R. Co.,* 295 U. S. 330 [55 Sup. Ct. 758, 79 L. Ed. 1468]), wherein the scheme of pooling the contributions of all carriers and treating all as one employer and

conferring benefits on those who had not contributed to the fund was held to be in violation of the due process clause, need not now be forecast, for the reason that our statute would appear to be a valid taxing statute and if in the disbursements of benefits thereunder such payments must under the law be made to those employees who had contributed to the fund or whose employers had so contributed (as provided in the unemployment insurance statutes of Utah and Wisconsin), our statute would nevertheless be valid under section 111 thereof as to those who had so contributed and inoperative as to those who had not. Our statute seems to be flexible enough to be operative under a plan of separate employment reserves, even if the pooled fund features of the statute be stricken. If this be not so the statute could still remain as a taxing statute and be amended as to its spending features, in such manner as to meet successful federal constitutional objections. In other words, it seems to us that the fact that in some instances certain unemployed persons who had not contributed to the fund may have been improperly made eligible to receive benefits should not be permitted to destroy the plan, assuming that such contribution be finally deemed essential under federal decisions.

▆▆▆ As to the broader constitutional question, it may not be doubted that it is within the reserved power of the state to establish an employment insurance system. The preamble and findings of the legislature in the state act are in consonance with what the court may judicially know, namely, that unemployment for several years past has presented serious and at times very acute problems for state and national governments. Vast sums of money have been expended for the relief of the unemployed and others whose need for subsistence has been caused by misfortune and indigence resulting from what has been recognized as an abnormal period of depression. Those vast sums have been obtained for the most part by pledging the credit of the state and nation through the issuance and sale of bonds and other securities. History discloses that financial panics, periods of depression or hard times are recurrent. After much investigation, research and thought upon the subject, the legislature has determined that it is wise and prudent policy to provide in advance some measure of security as against the lean years which the future may bring forth.

If it be within this reserved power of the state to care for those in need when the actual need is present, and as to this there can be no question, it would seem to be likewise true that to anticipate the necessities of the future is not only a reasonable but a wise and salutary governmental policy. Whether the plan now projected is the best that could be devised is not the question. Economic theorists have divergent views on the subject, but it is not for the court to say whether some other plan would be preferable or that experience may demonstrate the economic fallacy of the particular plan promulgated. If constitutional restraints do not prevent, the legislative power is present. ▉ We now discover no insuperable obstacle to the accomplishment of the plan so far as the state Constitution is concerned. And there appears no lack of power in the legislature to adopt as a part of the state plan certain provisions of the federal law on the same subject. (*In re Burke,* 190 Cal. 326 [212 Pac. 193].)

▉ It is suggested by the respondent commission that, for the purpose of the present proceeding this court assume that the federal act is in conformity with the provisions of the Constitution of the United States. It has also been suggested that the decision herein be delayed until the question of the validity of the federal statute has been passed upon by the Supreme Court of the United States, a course which may at times be appropriately followed.

We are not disposed to follow the second course suggested for reasons which seem to be persuasive. It appears from the petition that there are in California approximately 16,000 employers and 1,200,000 employees subject to the requirement of contribution under the state act for the year 1936; that the aggregate of these contributions for this year is about $15,000,000. If these contributions be not timely collected under the state act and deposited in the federal trust fund no credit on the federal exactions can be received by those required to contribute under the state act, in which event both federal and state exactions without deductions would have to be paid. Although the statutory penalty for nonpayment of the federal tax is only one-half of one per cent per month and the penalty for nonpayment of the state exactions is only one per cent per month from the time the payments become due it nevertheless seems

desirable now to place the employers of the state subject to the tax in position to receive the credits allowed on account of payment of contributions under state law if they desire to avail themselves of such right to credit. This, too, without any lasting prejudice to the contributors under the state law. If the federal statute in so far as it relates to unemployment insurance be held invalid by the court of last resort, the state act covering the same subject matter would probably fall with it under section 2 thereof.

Some anxiety is expressed by *amici curiae* lest the contributions made under the state act be lost to them or to the state in the event the federal act be invalidated. We think no serious apprehension in that regard need be entertained. The same question arose in the state of New York immediately following the approval, on April 15, 1936, of the unemployment insurance law of that state by the New York court of appeals. (*Chamberlin Inc.* v. *Andrews,* 271 N. Y. 1 [2 N. E. (2d) 22].) [Note: Since the preparation of this opinion the Supreme Court, on November 23, 1936, by an equally divided· court and without opinion affirmed the judgment of the New York court of appeals in the Chamberlain case, 299 U. S. 515 [57 Sup. Ct. 122, 81 L. Ed. ――]. Assurances were then tendered by the Secretary of the Treasury recognizing the trust character of deposits made pursuant to state laws and stating that if the federal act should be held invalid the secretary would honor requisitions by any state agency to the extent of its balance in the federal trust fund. While these assurances may not be said to have the binding force of a statute or judgment in the premises, there appears to be no good reason why this course could not or should not be followed. The funds so deposited do not belong to the United States. The beneficial title thereto is in the state or in the state agency depositing the same, which in turn is trustee for those who had made the contributions, or for the beneficiaries under the state act.

In support of the position of the respondent controller, *amici curiae* take the position that before a peremptory writ herein can be justified it is necessary that this court pass upon the constitutionality of the Federal Social Security Act. Their theory seems to be that since the state act declares that it shall become effective only upon the enact-

ment by the United States government of legislation providing for a payroll tax applicable in all the states, it must be assumed that a valid federal law on that subject would be enacted, and that if no valid federal law has been enacted the state law has not gone into effect. Accordingly, *amici curiae* have ably presented their contentions that the federal law is invalid for the many reasons advanced by them. It is well known that the enactment of the Federal Social Security Act and of unemployment insurance statutes in fifteen states (Alabama, California, Idaho, Indiana, Massachusetts, Mississippi, New Hampshire, New York, Oregon, Rhode Island, South Carolina, Texas, Utah, Washington, but see *Johnson* v. *State,* 187 Wash. 605 [60 Pac. (2d) 681], and Wisconsin), and in the District of Columbia, has given rise to many federal constitutional questions. They cannot all be resolved with certainty by reference to cases determined by the Supreme Court of the United States. Whatever we might say on that subject would not be final. For the purposes of this case we might well assume that since Congress has spoken on a matter generally within its power, its action in that respect is the law of the land until set aside by the court of last resort. But it is not necessary to proceed alone on that assumption for the reason that we arrive at the same ultimate conclusion without it. Certain it is that the payroll tax imposed by the federal act is the kind of tax which is authorized under federal law. As affecting employers it is an excise tax, or a tax on the right to do certain things and as such is not a direct tax prohibited by paragraph 4 of section 9 of article I of the federal Constitution. (*Flint* v. *Stone Tracy Co.,* 220 U. S. 107 [31 Sup. Ct. 342, 55 L. Ed. 389, Ann. Cas. 1912B, 1312]; *Thomas* v. *United States,* 192 U. S. 363 [24 Sup. Ct. 305, 48 L. Ed. 481]; *Patton* v. *Brady,* 184 U. S. 608 [22 Sup. Ct. 493, 46 L. Ed. 713]; *McCray* v. *United States,* 195 U. S. 27 [24 Sup. Ct. 769, 49 L. Ed. 78, 1 Ann. Cas. 561]; *Bromley* v. *McCaughn,* 280 U. S. 124 [50 Sup. Ct. 46, 74 L. Ed. 226]; *Nicol* v. *Ames,* 173 U. S. 509 [19 Sup. Ct. 522, 43 L. Ed. 786].) The tax on the employee is either an income tax and as such is authorized by the sixteenth amendment, or is a tax on earnings for personal services and as such is an excise tax authorized even without the sixteenth amendment. (*Springer* v. *United States,* 102 U. S. 586 [26 L. Ed.

253].) The rule as to the required uniformity (geographical uniformity), is not violated, for "it operates with the same force and effect in every place where the subject is found". (Head Money cases, 112 U. S. 580 [5 Sup. Ct. 247, 28 L. Ed. 798] ; *Knowlton* v. *Moore,* 178 U. S. 41 [20 Sup. Ct. 747 44 L. Ed. 969].) And there would appear to be no infirmity in the federal statute by reason of the credit therein allowed on account of the payment of like exactions under state law, as is done in the case of federal and other inheritance taxes. (*Florida* v. *Mellon,* 273 U. S. 12 [47 Sup. Ct. 265, 71 L. Ed. 511].)

It is clear, therefore, that the federal government has the power to levy and collect the employer excise taxes such as have been imposed for general revenue purposes and to grant the credits for payments made under state law.

 It is unnecessary to explore further the intendments of the federal act to determine whether its purpose is to coerce the states to enact an employment compensation law in conformity with the federal plan. It is enough for present purposes that the contingency on which the state act was to become effective, namely, the enactment by Congress of a payroll tax against which all or any part of the contributions required by the state act may be credited, has taken place. In other words, the federal act answers the description of federal legislation the enactment of which would put the state act into operation.

As to the alleged coercive features of the federal act, it is plain that there is no coercion of the employer or taxpayer in a state in a matter purely of state concern, such as was condemned as being in violation of the fifth amendment in the Hoosac Mills case involving the validity of the Agricultural Adjustment Act (*United States* v. *Butler,* 297 U. S. 1 [56 Sup. Ct. 312, 80 L. Ed. 477, 102 A. L. R. 914]), and other cases to like effect relied on by *amici curiae.* If there is any coercion by the federal government it is coercion of the states themselves, which as to California is not apparent for the reason that, as above noted, the state act was approved by the Governor on June 25, 1935, and the federal act was not approved by the President until August 14, 1935. It is difficult to perceive how the alleged federal coercion could apply to a state act passed before the federal law was enacted. Rather it would seem that the state legis-

lature recognized the necessity and salutary effect of joint action by state and national law-making bodies and enacted the state law with the hope and expectation of the enactment of a federal law as outlined in the bill then pending in Congress.

The magnitude of the federal-state plan and the complexities of its operation indicate that many questions may hereafter arise, particularly with reference to the administration of its trust by the respondent commission. Enough has been said for present purposes.

The order about to be made will be made on the assumption that the deposit by the respondent State Treasurer of the state unemployment funds will be made in a national bank within this state to be designated for such deposit by the Secretary of the Treasury of the United States.

Let the peremptory writ as to all of the respondents therefore issue as prayed.

Waste, C. J., Curtis, J., Langdon, J., and Seawell, J., concurred.

Edmonds, J., not having been present at the argument of this case, did not participate in the decision.

A petition for a rehearing was denied on December 21, 1936, and the following opinion then rendered thereon:

THE COURT.—The petitioner has filed an application for a rehearing not for the purpose of reopening the case but for the purpose of propounding two questions which, it is stated, should be further discussed. The first query is whether the withdrawal of moneys by the Secretary of the Treasury as required by section 904, paragraphs (a) and (b), of the federal act would be in contravention of any provision of the state Constitution.

We think it would necessarily follow from what is stated in the opinion that the peremptory writ could not properly issue if any provision of the state Constitution would prohibit the investment of moneys in the unemployment trust fund for the benefit of that fund in the manner provided by the federal-state plan. We find nothing in

the state Constitution to prevent the legislature from providing, as here, that the funds deposited by the State Treasurer in a duly designated national bank within this state be invested in interest-bearing securities and in effect designating the Secretary of the Treasury as the one to select those securities, subject, however, to the restriction that the securities so selected and deposited must be interest-bearing obligations of the United States or obligations the payment of which as to both principal and interest is guaranteed by the United States. If we mistake not, the obligations so required are considered the highest form of security. When the deposits are so made the book account of the state of California is set up and maintained and when the funds therein are invested by the Secretary of the Treasury the custody of the securities representing the investment would properly be subject to the order of the Secretary of the Treasury as the conservator of the fund for the benefit of this state.

The second query is whether under section 22 of article IV of the state Constitution the warrant of the State Controller is required to authorize the Secretary of the Treasury to withdraw moneys in the unemployment trust fund for investment for the benefit of the fund. The section referred to governs the withdrawal of money from the state treasury, that is, upon warrant of the controller. It is assumed that the money in the unemployment fund in the state treasury will be withdrawn for deposit in the unemployment trust fund of the United States only upon the warrant of the controller. When that warrant has been issued the constitutional section has been complied with and the controller has discharged his function. There is nothing in the opinion to indicate that the controller has any authority over these funds after they have left the state treasury and have been deposited in a duly designated national bank. If they should thereafter find their way back into the state treasury in the course of the administration of the state act, the requirements of section 22 of article IV would undoubtedly again attach. But that question is not involved here.

The respondent controller has raised a question as to the form which his warrant should take in order to make the proper deposit in a designated national bank within

this state. As we view it this is primarily an administrative question. It should be sufficient to say, however, that any form would be satisfactory which would indicate generally that the deposit is made in a duly designated depositary of the United States within this state for the separate book account of the state of California in the unemployment trust fund of the United States, and subject to the order of the Secretary of the Treasury of the United States as provided by the Federal Social Securities Act and the State Unemployment Reserves Act. (Stats. 1935, p. 1226.)

The petition for rehearing is denied.