[L. A. No. 18660. In Bank. July 5, 1944.]

CALIFORNIA EMPLOYMENT COMMISSION, Respondent, v. LOS ANGELES DOWN TOWN SHOPPING NEWS CORPORATION (a Corporation), Appellant.

Gibson, Dunn & Crutcher, Henry F. Prince and Norman S. Sterry for Appellant.

Robert W. Kenny, Attorney General, Clarence A. Linn, Deputy Attorney General, Forrest M. Hill and Doris H. Maier for Respondent.

EDMONDS, J.—Los Angeles Down Town Shopping News, owned by the appellant corporation, is a publication devoted to the advertising of retail merchants. It has no subscribers but, without charge, regularly on Wednesday and Saturday of each week, carriers leave a paper at each dwelling house within certain designated territories. The Employment Com-

mission (formerly the Unemployment Reserves Commission) has ruled that these carriers are employees within the meaning of the Unemployment Insurance Act (formerly the Unemployment Reserves Act, Stats. 1935, chap. 325, p. 1226, as amended; Deering's Gen. Laws, 1935 Supp., Act 8780d, as amended) and sued the publisher for the amount assertedly due as contributions to the unemployment fund. The corporation's appeal is from a judgment in favor of the commission.

The paper has been published since 1922, and at the date of the trial was distributed by about 1,000 boys, selected by the corporation, more than 90 per cent of whom were under 18 years of age. They had no written contract but were assigned to specific routes under an oral agreement terminable at the will of either the publisher or the carrier. Each boy was required to obtain a work permit from the school authorities. Compensation ranged from $2.00 to $2.50 per week, depending upon the route to which the boy was assigned.

The distribution area was divided into districts, each in charge of a manager responsible to the publisher's circulation manager. Reporting to the district manager were inspectors, each having approximately 10 routes under his jurisdiction. The inspector supervised the delivery of the paper by the carriers and required compliance with the rules and instruction of the publisher. Since 1938 there have been junior inspectors to assist in directing the delivery system.

The publisher's truck delivered the papers to specified places, where each carrier checked in with his junior inspector and received his allotment with a Shopping News bag. The boy was required to walk the route and could not use skates, a bicycle or other means of conveyance. The delivery rules specified how the paper should be placed at each residence and the boys were instructed not to walk on lawns, or in flower beds. They were permitted to have one helper, approved by the Shopping News. Each boy was required to complete the delivery of the papers on his route by 8 a. m. on Wednesdays and 9 a. m. on Saturdays. He then reported whether he was short or over in the number of papers delivered. The inspectors checked all complaints made regarding the manner in which papers were delivered and the boys were subject to dismissal for failure to comply with the publisher's instructions.

Upon these facts, the superior court found that Los Angeles Down Town Shopping News Corporation had the right of potential and actual control over the carriers as to the manner and means of the performance of their work in connection with the distribution and delivery of the Shopping News and other advertising matter which was from time to time delivered by them. These carriers were not independent contractors, the court declared, and it concluded that the publisher was an employer within the meaning of the Unemployment Insurance Act, *supra,* and subject to its provisions during the years 1936, 1937 and 1938. Judgment accordingly was rendered in favor of the commission in the amount payable for the period not barred by the statute of limitations. (Code Civ. Proc., § 338.)

The appellant contends that the carrier boys were independent contractors and not in ''employment'' within the meaning of section 6.5 of the Unemployment Insurance Act, *supra.* And the term ''employment'' as used in that statute, says the publisher, must be read with the same meaning which it had generally under the law of California at the time the unemployment legislation was adopted. But if the boys were in ''employment,'' the argument continues, the act is inapplicable to them because the express terms used by the Legislature evidence an intention to exclude from the operation of the enactment persons earning less than the minimum amount entitling them to benefits under its provisions, and particularly to school boys earning ''pocket money'' through part time employment. The commission takes the position that the act not only includes the persons who are employers or employees, as judicially defined at the time the act became effective, but also those in ''any relationship where the income of an individual is dependent upon the will of another.'' If the act is limited in its application to the employer-employee relationship, the commission declares, the finding of the trial court, that such relationship existed should be sustained and the judgment affirmed upon the ground that the carriers in ''employment'' under the act received remuneration which constituted ''taxable wages.''

An independent contractor is a person who is engaged in an independent employment or occupation, responsible to his principal only for the result and not for the manner or means by which it is accomplished. (*Moody* v. *Industrial Acc.*

*Com.*, 204 Cal. 668 [269 P. 542, 60 A.L.R. 299].) In determining whether an individual is an employee or an independent contractor, the most important factor is the *right* to control the manner and means of accomplishing the result desired. If the employer has the power to exercise complete control, whether or not that potential control is exercised with respect to all details, an employer-employee relationship exists. (*S. A. Gerrard Co.* v. *Industrial Acc. Com.*, 17 Cal.2d 411 [110 P.2d 377]; *Murray* v. *Industrial Acc. Com.*, 216 Cal. 340 [14 P.2d 301]; *Moody* v. *Industrial Acc. Com., supra; Hillen* v. *Industrial Acc. Com.*, 199 Cal. 577 [250 P. 570]; *Press Publishing Co.* v. *Industrial Acc. Com.*, 190 Cal. 114 [210 P. 820]; *Claremont Country Club* v. *Industrial Acc. Com.*, 174 Cal. 395 [163 P. 209, L.R.A. 1918F 177]; *Western Metal Supply Co.* v. *Pillsbury*, 172 Cal. 407 [156 P. 491, Ann. Cas. 1917E 390]; Rest. Agency, § 2.) And strong evidence of the employer's control is his right to discharge at will, without cause. (*Globe Indemnity Co.* v. *Industrial Acc. Com.*, 208 Cal. 715 [284 P. 661]; *Press Publishing Co.* v. *Industrial Acc. Com., supra; Melone* v. *Industrial Acc. Com.*, 9 Cal.App.2d 569 [50 P.2d 503]; *Call Publishing Co.* v. *Industrial Acc. Com.*, 89 Cal. App. 194 [264 P. 300].)

In the present case there is substantial evidence to support the findings of the trial court that the boys were employees within the meaning of the Unemployment Insurance Act, *supra*. As defined by that statute, the term "employment" means "service . . . performed for wages or under any contract of hire, written or oral, express or implied." (§ 6.5, as amended in 1937.) The testimony clearly shows that the publisher of Shopping News had the right to entirely control the manner and time of its distribution. Although the carriers were allowed to cover their routes in the manner they chose with reference to the point of starting and ending, the corporation not only reserved the right to direct the boys' work in almost every other detail but it exercised that right. Moreover, a boy's employment was terminable either without cause or for noncompliance with the corporation's requirements as to delivery of the paper. Certainly, under these circumstances, there is no basis for a determination that the boys were independent contractors.

Turning to the second point presented by the appel-

lant, it is earnestly urged that if the boys who worked during the period specified by the complaint were "employees" within the meaning of the Unemployment Insurance Act, *supra,* the legislation is nevertheless inapplicable to them by reason of its express terms. In support of this contention, the publisher points to the provisions of the statute which state the basis for the legislation and specify the persons who are eligible for benefits from the unemployment fund.

Section 1 of the statute declares that, due to the lack of "permanent employment" by large numbers of persons, "by reason of which their purchasing power is unstable," those who contribute to the production and distribution of "consumption goods" are unable to purchase them and, since private charity and local relief are inadequate to prevent the harmful effects of unemployment, "this act is designed to accumulate a reserve to assist in protecting . . . against . . . unemployment. . . ." By the amendment to this section adopted in 1939, the Legislature stated that the purpose of the unemployment insurance fund was to provide "benefits for persons unemployed through no fault of their own. . . ." Originally a worker was eligible to receive a weekly benefit whenever his wages were less than the amount to which he would be entitled if totally unemployed. Commencing in 1937, an employee must have earned at least $156 for the preceding year in order to qualify for benefits. Since 1939, the base has been $300. (Deering's Gen. Laws, 1937, Act 8780d, § 56, and 1939 Supp. Act 8780d, § 57), and an "unemployed" person may earn as much as $3.00 a week without affecting his right to benefits. The term "employment" is broadly defined, with certain specified exceptions such as agricultural labor, domestic work in a household, and public service.

The only provision concerning minors excludes from the definition of "employment" the "service performed by a child . . . in the employ of his father or mother" (§ 7d), and unless it may be said that a person earning less than the amount entitling him to benefits is not an employee within the meaning of the statute, the publisher must pay contributions based upon the wages of the carriers who worked for it during the years 1936, 1937 and 1938. The record shows that a few of the boys working for Shopping News had employment other than that as a carrier and earned total wages exceeding the minimum amount which determines eligibility. However, one who pays

a worker wages amounting to less than that minimum is not excused from making contributions based upon the amount of such compensation, for it must be presumed that the Legislature has specified within its enumeration of the services not included in the term "employment," all of the persons whose earnings shall not be subjected to the payment of contributions.

The legislation constitutes a valid exercise of the state's taxing power (*Carmichael* v. *Southern Coal & Coke Co.*, 301 U. S. 495 [57 S.Ct. 868, 81 L.Ed. 1245, 109 A.L.R. 1327]; *Gillum* v. *Johnson*, 7 Cal.2d 744 [62 P.2d 1037, 63 P.2d 810, 108 A.L.R. 595]), and its objects and purposes are not limited to the raising of revenue. It is a remedial statute and as such must be liberally construed for the purpose of accomplishing its objects. (*California Employment Com.* v. *Black-Foxe Military Institute*, 43 Cal.App.2d Supp. 868 [110 P.2d 729]; *County of Los Angeles* v. *Frisbie*, 19 Cal.2d 634 [122 P.2d 526].)

Certainly the appellant's conclusion that the legislation was intended only to apply to persons regularly engaged in "permanent employment" in the distribution and production of "consumption goods," and was enacted to provide unemployment insurance for the benefit of persons ordinarily in "permanent employment" who, due to economic conditions, are "unemployed through no fault of their own," places a much too narrow interpretation upon the language of the act. However, it should be noted that no constitutional question has been presented in this case. On the contrary, the parties have proceeded upon the theory that the legislation, insofar as it taxes the wages of the carriers, meets all constitutional tests.

The judgment is affirmed.

Gibson, C. J., Carter, J., Traynor, J., and Schauer, J., concurred.

CURTIS, J.—I dissent. As I understand the majority opinion, it requires an employer to pay contributions and to make deductions from wages of employees in support of the unemployment fund, although such employees' wages are less than the minimum entitling them to receive the benefits of the California Unemployment Insurance Act upon becoming unemployed. (Stats. 1935, chap. 352, p. 1226, as amended;

Deering's Gen. Laws, 1935 Supp., Act 8780d, p. 2039, as amended.) I do not believe that a reasonable interpretation of this legislation sustains such a conclusion.

The act is an integrated and self-contained aggregation of rules, built one upon the other, all of which rules are phrased in certain terms, which in turn are carefully and *artificially* defined. Each clause of the statute must be read in the light of all the rest of the statute—most particularly in the light of the definitions.

As the problem is here presented, the disputed point is the identification of the "employer" who is liable for payment of contributions to the unemployment fund. In the first place, to be subject to the tax, the employer must employ individuals in the conventional legal sense; that is, the legal relationship of employer and employee must be established. Assuming, as the majority opinion in short holds, that the facts herein do establish such legal status, there still remains the question of whether the Los Angeles Down Town Shopping News is an "employer" within the special meaning of the act. Concededly, the specifically excepted services—such as agricultural labor or domestic work in a household—do not constitute "employment" under the act, and the employer of individuals in occupations which are so expressly without the coverage of the act would not be required to make contributions based on "wages" paid for such "employment." Upon like reasoning, no more liable as a taxpayer is the employer of individuals who are just as definitely excluded from the benefits of the act not by reason of the character of their work but *by reason of their minimum earnings* according to the declared operative schedule of the applicable legislation. Thus, at the time involved herein, an employee must have earned in the preceding year not less than $156 in order to qualify for benefits (Stats. 1937, ch. 743, p. 2064; Deering's Gen. Laws, 1937, vol. 2, Act 8780d, § 56, p. 4136)—a sum considerably more than the yearly aggregate of newsboy carriers receiving $2.00 to $2.50 per week and denoting the base pay for services which would be deemed "employment" within the meaning of the act.

The legislative scheme manifestly contemplates that the taxable pay roll should relate to the "employment" of *persons entitled to the benefits of the act,* and that the respective c tributions of the "employer" and "employee" must be m

sured accordingly. This plan has been followed and emphasized in pertinent additions to the act. In 1939 section 9.2 was adopted to provide: "An individual shall be deemed 'unemployed' in any week during which he performs no service and with respect to which no wages are payable to him, or *in any week of less than full-time work if the wages payable to him with respect to such week are less than his weekly benefit amount.*" (Stats. 1939, ch. 674, § 2, p. 2146; Deering's Gen. Laws, 1939, Supp., Act 8780d, § 9.2, p. 1702.) At the same time the Legislature increased the base pay to $300 (Stats. 1939, ch. 674, § 13, p. 2151; Deering's Gen. Laws, 1939, Supp., Act 8780d, § 57(e), p. 1723) and provided that an "unemployed" person may earn as much as $3.00 a week without affecting his right to benefits. (Stats. 1939, ch. 674, § 12, p. 2150; Deering's Gen. Laws, 1939, Supp., Act 8780d, § 55, p. 1721.) Thus, the base pay determinative of *eligibility* to the unemployment benefits is even more clearly defined as the basis for computation of the "taxable pay roll" within the operative force of the act. Accordingly, a conceded employee earning less than $3.00 a week would be deemed "unemployed," and it necessarily follows that the respective percentage contributions from the "employer" and "employee" would not be required from such minimum compensation.

It is true, as the majority opinion notes, that the act "is a remedial statute and as such must be liberally construed for the purpose of accomplishing its objects"—the relief of unemployment—but it seems to be a clear perversion of legislative intent to assume that wages paid to persons expressly made ineligible to the protection of the act are nevertheless taxable. To so extend the operation of the statute to persons not within its letter appears to be not only improper, but likewise cause for challenge of its constitutionality. It is argued that since the contributions collected on wages go into a common fund for the purpose of paying unemployment insurance benefits, whether or not the person whose earnings are so taxed draws such benefits is of no importance. (*Matter of Cassaretakis,* 289 N.Y. 119 [44 N.E.2d 391]; *Carmichael* v. *Southern Coal & Coke Co.,* 301 U.S. 495 [57 S.Ct. 868, 81 L.Ed. 1245, 109 A.L.R. 1327]; *Steward Machine Co.* v. *Davis,* 301 U.S. 548 [57 S.Ct. 883, 81 L.Ed. 1279, 109 A.L.R. 1293].) In this regard it is suggested that "we all

pay insurance premiums of one kind or another, but we do not all collect on our policies." That is true enough, but how long would we continue ot pay premiums if we knew we, or our beneficiaries, would not be *eligible* to receive any benefits if the contingency insured against occurred? Upon like considerations it is reasonable to assume that the act contemplates as "employees" only those persons *eligible* to draw benefits if the contingency—unemployment—occurs, and only their "wages" should constitute the pay roll basis for the taxable contributions.

The above noted cases are not persuasive of any other conclusion. First, in considering the Cassaretakis decision, it is pertinent to note the distinguishable feature of the New York Unemployment Insurance Law which puts the *entire burden* for contributions upon the employer. The question there presented was whether the New York statute was applicable to marine employments. In holding that employees in such work were within the protection of said law and entitled "to receive the benefits upon becoming unemployed," the New York Court of Appeals at page 126 made the following observation cited by the commission herein: "This tax is an excise based upon the exercise of the privilege of employing individuals. (citing the Carmichael and Steward cases, *supra*.) The obligations of the employer under this law are not to his employees but to the state. Likewise, claimants of benefits assert their rights against the state and not against the employer. The employer's duty to pay contributions and the employee's right to receive benefits are independent of each other. The employer must continue to pay the tax although none of his employees ever becomes entitled to benefits through *lack of employment; the employee has a right to receive benefits upon becoming unemployed* although his employer has failed to contribute." (Italics added.) Significant in this language is the recognition that *the employee within the scope of the act is the one entitled to its benefit features*, and that the employer's payment of a nondiscriminatory excise tax based upon his exercise of the privilege of employing an individual to perform services for him is independent of his *employee's right* to the statutory coverage *upon becoming unemployed*. The decision thus stands for the desirability of construing a state unemployment insurance law to *protect* as many employments as are fairly within its scope and in-

crease the number of potentially eligible recipients of benefits, but it does not touch upon the problem here presented where the legislative plan provides for contributions to be exacted from *both* the employer and employee upon the basis of a pay roll for services not excepted from the terms of the California act.

The Carmichael case, *supra*, sustained the constitutionality of the Alabama Unemployment Compensation Act, which was attacked on the following grounds: (1) That it infringed the due process and equal protection clauses of the Fourteenth Amendment; (2) That the state was coerced by the federal government in adopting the Social Security Act; and (3) That it involved an unconstitutional surrender of power by the state to the federal government. Like the California statute, the Alabama act provides for contributions by employers and employees, and the pay-roll levy creating a fund for use for relief of unemployment was designated an "excise tax"—an exaction on the right, on the one hand, to employ, and, on the other hand, to be employed. (*Carmichael* v. *Southern Coal & Coke Co., supra,* 301 U.S. 508; see, also, *Gillum* v. *Johnson,* 7 Cal.2d 744, 763 [62 P.2d 1037, 63 P.2d 810, 108 A.L.R. 595].) But in so upholding the Alabama Act insofar as the questions raised under the federal Constitution were concerned, the Carmichael case did not consider the propriety of including in the taxable pay roll wages of persons *excluded* from the benefits of the state unemployment insurance law. Rather that case assumes throughout that the base pay refers to "employment" within the coverage of the state law and that the burden on the employee is offset by his *eligibility* to the statutory benefits *on becoming unemployed.*

The Steward case, *supra*, upheld the validity of the tax imposed by the Social Security Act upon *employers* as within the power conferred upon Congress to levy an "excise" on the right to have individuals in employment, but necessarily under the scheme of the federal legislation involved the *employee's relation to the taxable pay roll* insofar as coverage was concerned was not considered. The distinguishable element of the California act is its manifest contemplation that only the wages of persons "in employment" as therein prescribed should be included in the taxable pay roll determina-

tive of the contributions of *both* the employer and the employee.

As a further point to be noted here, the majority opinion states: "The record shows that a few of the boys working for Shopping News had employment other than that as a carrier and earned total wages exceeding the minimum amount which determines eligibility." Such observation as to the total earnings of a *few* of the newsboy carriers does not fortify the propriety of the judgment herein holding that the wages of *all* the newsboy carriers, the great majority of whom were receiving total wages *less than* "the minimum amount which determines eligibility," are to be included in the taxable pay roll. In my opinion, the *ineligibility* of a conceded employee to enjoy the protection of the act because not "in employment" within its meaning—whether by reason of the *character* of his work or the *below minimum earnings*—is a controlling factor in establishing the exclusion of his wages from the base pay roll determinative of the respective and related contributions of the employer and the employee.

Upon the premise of this interpretation of the Legislature's plan of unemployment relief as embodied in the act—that it does not apply where the employee upon becoming unemployed is *without its benefit coverage*—the judgment herein should be reversed.

Shenk, J., concurred.

Appellant's petition for a rehearing was denied August 4, 1944. Shenk, J., and Curtis, J., voted for a rehearing.