[Civ. No. 287. Fourth Appellate District.—March 3, 1930.]

ROYAL INDEMNITY COMPANY (a Corporation), Petitioner, v. INDUSTRIAL ACCIDENT COMMISSION et al., Respondents.

Harry P. Sweet for Petitioner.

Edward O. Allen for Respondents.

BARNARD, J.—This is a petition for *certiorari*, seeking to annul an award of the Industrial Accident Commission in favor of D. R. Murray and against Royal Indemnity Company, a corporation, as the insurance carrier for one M. Brauer.

After a hearing and a rehearing, the Industrial Accident Commission found that the said Murray was an employee of the said Brauer and had sustained the injury complained of in the course of his employment. Briefly stated, the facts are as follows: Brauer was operating a real estate office in the city of San Diego and advertised for salesmen. Murray answered the advertisement and entered Brauer's office under some arrangement, the exact nature of which is here in controversy. A short time later Murray inserted an advertisement in a newspaper to the effect that he had a client who desired to purchase a small piece of land. In response to this advertisement a man named Bean phoned the office and asked for Murray. Brauer took his name and address and later Murray called him on the phone, and arranged to go with him to inspect a parcel of land which Bean desired to sell. Just before they arrived at the land Murray observed some avocado trees on an adjoining property. He left the road and entered that property for the purpose of seeing whether or not there was fruit on these trees. While on this mission he slipped, fell down an incline and received the injuries for which compensation was later awarded. The Industrial Accident Commission found that his injuries arose out of and in the course of his employment, and that he was at that time an employee of Brauer.

The principal question to be here considered is whether or not the respondent Murray was, at the time of the injury, an employee of the said Brauer. The law is well settled as to the tests that are to be applied in distinguishing an employee from an independent contractor. The general rules are summarized in *Moody* v. *Industrial Acc. Com.*, 204 Cal. 668 [60 A. L. R. 299, 269 Pac. 542, 543], as follows:

"Section 8 (b) of the Compensation Act, above referred to, provides that 'Any person rendering service for another, other than as an independent contractor, or as expressly excluded herein,' is presumed to be an employee within the meaning of this act.' Many definitions of an 'independent contractor' have been made, but they are not essentially different. (*Franklin Coal Co.* v. *Industrial Com.*, 296 Ill. 329, 334 [129 N. E. 811].) ██ The following definition may be regarded as a correct statement of what constitutes an independent contractor: One who ren-

ders service in the course of an independent employment or occupation, following his employer's desires only in the results of the work, and not the means whereby it is to be accomplished. (*Brown* v. *Industrial Acc. Com.*, 174 Cal. 457, 460 [163 Pac. 664]; *Green* v. *Soule*, 145 Cal. 96, 99 78 Pac. 337]; *Barton* v. *Studebaker Corp.*, 46 Cal. App. 707 [189 Pac. 1025]; *North Bend Lumber Co.* v. *Chicago etc. R. Co.*, 76 Wash. 232, 242 [135 Pac. 1017].) 'It is well settled that where one person is performing work in which another is beneficially interested, the latter may exercise over the former a certain measure of control for a definite and restricted purpose without incurring the responsibilities, or acquiring the immunities, of a master, with respect to the person controlled.' (*Western Indemnity Co.* v. *Pillsbury*, 172 Cal. 807, 811 [159 Pac. 721].) The decisive test of the relationship is: Who has the right to direct what shall be done, and when and how it shall be done? Who has the right to general control? (*Lassen* v. *Stamford Transit Co.*, 102 Conn. 76 [128 Atl. 117, 118]; see, also, *Fidelity & Casualty Co.* v. *Industrial Acc. Com.*, 191 Cal. 404, 407 [43 A. L. R. 1304, 216 Pac. 578].) In other words, the test of what constitutes independent service lies in the control exercised. The test of control means complete control, and we must carefully distinguish between authoritative control and mere suggestion as to detail. (*Western Indemnity Co.* v. *Pillsbury, supra.*)''

The occupation of real estate salesman is one that might come under the classification of employee, or independent contractor, depending upon the facts of the particular case. The fact that the compensation may consist of commissions on sales made, or a division of such commissions, is not determinative of the relationship. In *Hartford Acc. & Indem. Co.* v. *Industrial Acc. Com.*, 93 Cal. App. 313 [269 Pac. 733], it was held that a real estate salesman was an employee, the decision being based upon the fact that the employer exercised certain control over the mode or method of work of the salesman, and not merely over the results. Respondents justify the award in the instant case on the application of the above rules of law to certain facts in this case, which may be summarized as follows: Respondent Murray testified that he was working on the usual basis of sixty per cent of the commissions for the agent, and forty per cent for the employer; that he was acting in the capacity

of a salesman, selling real estate. When asked what type of business he was to handle, he replied: "Well, I think we discussed that I would handle exchanges, and that it was later understood we might work together. We were alone in the office for a while; that is, before there was anyone else came in; as things would come up, Mr. Brauer would say, 'You go and see this party if you want to'; or he would suggest that whether it was a trade or not a trade, and by common consent and agreement that way, if anything different was made, we always discussed it and agreed upon it; if it were to be different from an exchange deal, why, he said, 'Go ahead.'" He testified that Brauer maintained the office, and paid for the advertisements; that he used Brauer's cards, and the listings were taken in Brauer's name. And further: "Q. What I mean is this: Mr. Brauer didn't care what you did with your time during the day; all he was interested in was having you close a deal, and when the deal was closed, you would then pro-rate the commission between you? A. He wasn't supposed to want a man around his office or in this connection unless he was a busy man; that is what he wanted and that is what I was trying to give in the way that it is commonly done, whatever a man can do." In reference to the particular call that resulted in the trip upon which he was injured, he testified: "I just stated Mr. Brauer turned over the call to me which he received over the telephone, which is customary. I would have done the same thing if he had been out; if I had received a call for him, I would have turned it over to him; likewise he had done the same with the call that he had to try to take care of the business that he was advertising." In reference to his first going to work, he testified as follows: "Q. When you first spoke to Mr. Brauer about associating yourself with him, isn't it true Mr. Brauer suggested you come in as a salesman and that you said, no, you preferred to remain an independent broker but that you would like to work out of his office as such? A. There was a conversation regarding my making application for a salesman's license and I just remarked that I did not think that that was necessary and the matter was left open at that point." In reference to his right to quit without recourse against him, he testified as follows: "A. There wouldn't be any recourse in the event there was

nothing unsettled; providing there was nothing unsettled. Q. Assuming you had been paid for everything you had earned up to that time and he just said, 'Murray, you are through.' A. Why yes, I wouldn't have any recourse because I had no contract. In the same way, I could say the same thing to him. I would say, 'I believe I will not remain longer.' Provided everything was in shipshape on both sides. I don't know of anything that would stop either one from taking issue.''

Mr. Brauer testified as follows: ''Q. Just how did Mr. Murray operate out of your office? Did you have any special time at which he was to report for work? A. No; he was to use his own judgment as to coming to work, or working his clients. I gave him the right to advertise, to make all calls come to him direct; all his advertisements called for Mr. Murray. . . . A. If I wanted to discontinue his services? There was no discussion as to that, but it is always understood that if a man does not want a man to work for him any more in a real estate office, he can tell him to discontinue the service and settle with him right there. Q. Did you feel that if Mr. Murray should have any reason desiring not to work out of the office, he could do that? A. Yes, sir. Q. In other words, you had the power, either of you could terminate without liability? A. At any time, yes, sir.''

In reference to their talk about a license, Brauer testified as follows:

''A. When I first advertised for salesmen, Mr. Murray came around. The first day he discussed the matter, he did not let me know definitely whether he could come or not; he came back a day or so afterwards when he decided that he was coming and work with me. I gave him a salesman's application blank to fill out and he told me he did not want to fill that out; he did not want to relinquish his broker's license; that he would have his broker's license transferred to this office. I asked him to do that and I found later that he didn't do that.''

In *Bennett* v. *Truebody*, 66 Cal. 509 [56 Am. Rep. 117, 6 Pac. 329, 331], the court said: ''The plumber was left to produce the desired result in his own way. If that did not constitute him an independent contractor, we do not know what would.'' We feel there is absolutely no evidence in

this record to show that respondent Murray was not free to produce the desired result of his work in his own way. It is true that Brauer testified "it is always understood that if a man does not want a man to work for him any more in a real estate office, he can tell him to discontinue the service and settle with him right there." But he also testified that after the first conversation Murray "came back a day or so afterwards, when he decided that he was coming and *work with me*." All of the facts taken together indicate a purpose on Murray's part to associate himself with Brauer rather than to become his employee. Brauer says Murray refused to give up his broker's license. When Murray was asked if he had not told Brauer that he preferred to remain an independent broker, and would like to work out of his office as such, he did not deny this, but answered, "There was a conversation regarding my application for a salesman's license, and I just remarked that I did not think that that was necessary, and the matter was left open at that point." In any event, it is undisputed that Murray did not take out a salesman's license, but continued to work under his broker's license. While section 18 of the California Real Estate Act permits a licensed broker to pay compensation to any other licensed broker, or to salesmen licensed under the broker who pays the compensation, it specifically provides, "No real estate salesman shall be employed by or accept compensation from any person other than the broker under whom he is at the time licensed." It was therefore unlawful for Murray to accept compensation as a real estate salesman from Brauer, although he had the right, as a broker himself, to divide commissions with him. If he did not specifically refuse to change his status in this respect, he at least had his attention called to it, and the circumstance is of great significance in determining the relationship existing between these parties.

The other circumstances show no control over the movements, or methods, or mode of operation of the respondent Murray, but only an interest in the results of his work. Murray testified: "We discussed that I would handle exchanges and it was later understood we might work together." And again, "as things would come up Mr. Brauer would say 'you go and see this party if you want to,' " and again, "he would suggest that whether it was a trade

or not a trade, and by common consent and agreement that way, if anything different was made, we always discussed it and agreed upon it." He also testified that the call that came in the day he was injured, was the result of his own advertisement; that Brauer received the call and turned it to him, which was customary; and that he would have done the same thing if he had received a call for Brauer when he was out. He testified he had made no sales up to the time he was hurt; that he was working on an indeterminate arrangement; that he did not receive any sales instructions, nor did Mr. Brauer have a sales school; that there were no requirements as to his reporting to the office any time of day, and no specific time of reporting to the office or keeping in touch therewith. Respondent also testified, "We understood we were trying to sell real estate and that we were working to each other's hand, and Mr. Brauer, if he had any suggestions to make to me, he did it, and if I had any questions to ask him or points to raise with him, I did it." He also states he remained in the office, or went out, as he pleased. While he advertised on Brauer's contract, he used his own name and when people called for him, these calls were turned to him by Brauer. When asked whether it was not true that Brauer did not care what he did with his time during the day, but was only interested in having him close a deal and then prorating the commission, instead of denying this, he answered as follows: "He wasn't supposed to want a man around his office or in this connection unless he was a busy man." The record shows no contradiction to Brauer's testimony that "he was to use his own judgment as to coming to work, or working his clients. I gave him the right to advertise, to make all the calls come to him direct; all his advertisements called for Mr. Murray." Murray testified, "I operate on a straight commission basis, no salary, no drawing account, no expenses."

While the right to discharge a person at any time, without recourse, has been held to be a strong circumstance tending to show the subserviency of the employee (*Press Pub. Co.* v. *Industrial Acc. Com.*, 190 Cal. 114 [210 Pac. 820]), it is of less significance in a case of this sort, where it fits in equally with the theory of an independent association.

In this regard, both parties testified that the right to terminate their arrangement was a mutual one.

We think these circumstances show an association, rather than the relation of employer and employee. An employer does not suggest that an employee do the things for which he is hired, "if he wants to"; their work is not arranged by "common consent and agreement"; and an employer is usually interested in what an employee does with his time. Murray stated, in reference to the telephone call, that he would have done the same thing for Brauer; that if anything different was made they always discussed it and agreed upon it; that he had the same right to terminate the arrangement that Brauer had; that he did not change his license because he himself did not think it necessary; that he and Brauer were working to each other's hand; and that both made suggestions and raised points. These statements do not indicate an employment, and the entire circumstances fail to support the assumption that Murray was working illegally, and contrary to the provisions of the Real Estate Act. We find no evidence in the record showing any control over the means, manner or mode of the work, to have been exercised by Brauer, or reserved to him. We think the relationship between Murray and Brauer, as conclusively shown by the record, was the not unusual one of associated real estate brokers, rather than that of employer and employee.

A second point raised is that the injury suffered by Murray did not arise in the course of his employment, but arose when he was on a purely personal errand, having no relation to the sale of real estate. Were Murray an employee of Brauer, this contention would be without merit, as the evidence sufficiently shows his motive in examining the avocado trees, was to gain information that would assist him in selling the land, the sale of which was the object of the trip.

For the reason that the record discloses that the relationship of employer and employee did not exist in this case, the award is annulled.

Sloane, P. J., and Marks, J., concurred.