[Civ. No. 7195.   Third Dist.   Aug. 10, 1946.]

CALIFORNIA EMPLOYMENT STABILIZATION COMMISSION, Appellant, v. INTO WIRTA, as Administrator, etc., Respondent.

Robert W. Kenny, Attorney General, Clarence A. Linn and Doris H. Maier, Deputies Attorney General, for Appellant.

Hill & Hill for Respondent.

ADAMS, P. J.—This action was instituted under the provisions of sections 37, 38 and 44 of the California Unemployment Insurance Act [Stats. 1935, p. 1226, as amended; 3 Deering's Gen. Laws, Act 8780d], against defendant as administrator of the estate of Emil Wirta, for the collection of unemployment contributions, interest and penalties, for the period beginning July 1, 1939 and ending December 30, 1943. The decedent, during said period, operated what is known as a "tie camp" in Humboldt County. He employed certain employees including truck drivers, caterpillar and bulldozer operators and general utility men. Liability for failure to pay contribution upon these employees was admitted at the trial. However it was contended by plaintiff that certain other persons referred to as split products operators or "tie-makers" were also employees of decedent and that Wirta should have made contributions as to them. The trial court found to the contrary, and it is from its judgment in this behalf that this appeal was taken.

The evidence shows that decedent Wirta was engaged in the business of manufacturing and selling split products consisting of ties of various sizes, stakes, posts and shakes. He owned some timber and leased some from others. The "tie-makers" whose status is in question here, were skilled men, long experienced in their particular line of work. They operated as follows: Wirta would show them a "lay-out" consisting of a designated area, or a designated number of trees. They then bought the designated trees, or the trees on the designated area, upon a stumpage basis, felled the trees and made from them either shakes, ties, posts or stakes, according to their judgment as to which product or products could be made from them most advantageously. They were not told by Wirta or anyone in his employ what to make, they worked no regular hours, going and coming as they wished, sometimes "laying off" for periods of days. They furnished their own tools consisting of crosscut saws, dragsaws, axes

and wedges, and their own fuel to operate the dragsaws. They could, and sometimes did, take partners in to help in their work, and sometimes assisted one another in the felling of trees. Also they sometimes employed helpers whom they themselves paid. Their products were sold mainly to Wirta who purchased and paid for them on the basis of so much per 1,000 board feet. The products purchased by Wirta were counted, graded and culled by him and he hauled them from the woods. He did not inspect the work while it was being done. The operators could and sometimes did sell their products to others, and did not receive pay from Wirta for such products as he did not consider satisfactory. The products made by the operators remained their property until paid for by Wirta, and risk of loss was theirs. Wirta kept no records of the trees these men worked, they considered themselves their own "bosses," and they could quit work whenever they wished. Wirta could not discharge them, though he could refuse to sell any more trees to a man whose products were unsatisfactory. Wirta furnished meals and lodging to the operators if they desired to avail themselves of same, but they were charged for such facilities when they elected to use them. A form of agreement was introduced in evidence* but

---

*"AGREEMENT, executed this _____ day of _____, 1941, between E. WIRTA, herein called the Seller, and _____, herein called the Buyer.

"Seller agrees to sell, and Buyer agrees to buy certain specified redwood trees located upon the North half of the Northwest quarter of Section 16, Township 4 South, Range 3 East, Humboldt Base and Meridian, in Humboldt County, California, designated as trees Numbered _____, at the rate of _____ per thousand board feet stumpage, to be manufactured into split products by the Buyer and resold.

"The Seller agrees to purchase from the Buyer split products to be manufactured by the Buyer from said trees which meet specifications prescribed by the Seller, at the rate of _____ per thousand board feet. It is understood that the Buyer may sell said split products to whomever he desires by paying a toll of $1.00 per m. board feet for use of roads constructed and maintained by Seller.

"It is understood and agreed that no title to the real property upon which said trees are located passes to the Buyer. Should the Buyer fail to manufacture said trees, and logs and timber therefrom into split products within a reasonable time, to-wit, within 30 days after notice from the Seller, title thereto shall revert to the Seller. Risk of loss is on the Buyer.

"It is further understood that the Buyer is in no sense the employee of the Seller; that said Buyer operates entirely upon his own responsibility, at his own time and using his own tools and equipment. Buyer may, but shall not be obliged to, engage assistance or contract said work. In such event Buyer agrees to save Seller harmless from labor claims, liens, public liability and property damage done or suffered by the Buyer or anyone employed by him."

not all of the operators executed such contracts, and the evidence shows that the methods of operation, before and after the execution of the agreements were the same.

In view of the recent decision of the Supreme Court in *Empire Star Mines Co., Ltd.* v. *California Employment Com.,* 28 Cal.2d 33 [168 P.2d 686], we think that the evidence fully sustains the finding of the trial court that the "tie-makers" in question were not employees of Wirta, but that they were independent operators. In the Empire Star Mines case the court said, at page 43:

"The relationship contemplated by the legislation as the basis of the requirement for contributions is that of employer and employee; a principal for whom services are rendered by an independent contractor does not come within the scope of its provisions. (*Garrison* v. *State of California,* 64 Cal. App.2d 820, 824 [149 P.2d 711]; see *California Emp. Com.* v. *Bates,* 24 Cal.2d 432 [150 P.2d 192]; *California Emp. Com.* v. *Los Angeles etc. News Corp., supra* [24 Cal.2d 421 (150 P.2d 186)].) In determining whether one who performs services for another is an employee or an independent contractor, the most important factor is the right to control the manner and means of accomplishing the result desired. If the employer has the authority to exercise complete control, whether or not that right is exercised with respect to all details, an employer-employee relationship exists. Strong evidence in support of an employment relationship is the right to discharge at will, without cause. (*California Emp. Com.* v. *Bates, supra; California Emp. Com.* v. *Los Angeles etc. News Corp., supra.*) Other factors to be taken into consideration are (a) whether or not the one performing services is engaged in a distinct occupation or business; (b) the kind of occupation, with reference to whether, in the locality, the work is usually done under the direction of the principal or by a specialist without supervision; (c) the skill required in the particular occupation; (d) whether the principal or the workman supplies the instrumentalities, tools, and the place of work for the person doing the work; (e) the length of time for which the services are to be performed; (f) the method of payment, whether by the time or by the job; (g) whether or not the work is a part of the regular business of the principal; and (h) whether or not the parties believe they are creating the relationship of employer-employee."

The court then pointed out that the leasers, who in that case

were held to be independent contractors and not employees, determined for themselves what work they would do and how it would be done; they fixed their own working time; they were never requested to discharge anyone; the lessors' foremen and shift bosses never visited the leasers' work; the leasers sometimes hired men to assist them, and paid their wages; they carried on their work at their own risk in their own way, for their own profit.

The same may be said of the tie-makers in the case before us, and in addition thereto, the tie-makers bought the trees from which their products were made, and sold the products to Wirta if he wanted to buy them, or to others if he did not; their work was never inspected while it was in progress, and it is apparent that they were at all times considered as independent operators who knew their own business and were skilled therein, who could be depended upon to make the most of the timber sold to them, without any supervision, direction or control by Wirta of the method, manner or details of their operations.

Much less evidence from which a right of contract might be inferred is shown in the instant case than was shown in the case of the leasers in the Empire Star Mines case; and no right to discharge at will appears here. Appellant argues that a right to control appears because Wirta told the men what products to make. But the testimony shows, not that Wirta told them what to make, but that he told them what products he wanted or would like to have. They used their own judgment as to what they would make out of any particular tree. Appellant also argues that Wirta had the right to discharge tie-makers because he could refuse to give a new "lay-out" to an unsatisfactory operator. But that same right could have been exercised as to the leasers in the Empire Star Mines case, and cannot be said to constitute evidence of a right to control or evidence of an employer-employee relationship. It also argues that the tie-makers' products were sold only to Wirta. But there was testimony that "lots of times somebody sold them to somebody else."

Any conflicts in the evidence have been resolved against appellant by the trial court and its determination under such circumstances is conclusive here.

The judgment is affirmed.

Peek, J., and Thompson, J., concurred.