[L. A. No. 19368. In Bank. Sept. 11, 1946.]

CALIFORNIA EMPLOYMENT STABILIZATION COMMISSION, Appellant, v. EVERETT MARSHALL MORRIS, Respondent.

Robert W. Kenny, Attorney General, Clarence A. Linn and Doris H. Maier, Deputies Attorney General, for Appellant.

Eugene L. Wolver and Maurice Gordon for Respondent.

Milton Marks and Morris Lowenthal as Amici Curiae on behalf of Respondent.

EDMONDS, J.—The California Stabilization Commission asserts that in 1940 and 1941, certain salesmen and brokers associated with Everett Marshall Morris, a licensed real estate broker, were "in employment" within the meaning of the Unemployment Insurance Act (Stats. 1935, p. 1226, as amended; 3 Deering's Gen. Laws, Act 8780d) and sued for contributions assessed accordingly. The appeal from the judgment in favor of Morris presents for decision the question as to the status of these persons.

There is no conflict in the evidence. During the period for which contributions are claimed, Morris, doing business under the fictitious name of "State Development Company," engaged the services of six licensed salesmen and two licensed

brokers to sell land owned by him. Before the salesmen began their work, Morris, on behalf of each of them, signed either an application for a salesman's license or an application for the transfer of the salesman's license to himself as broker. He also aided prospective associates in reinstating dormant licenses. Each applicant paid his own license fee.

Morris had no formal written or oral agreement with any of his salesmen, except as to the amount of commissions payable upon each transaction. The brokers associated with Morris operated in the same manner as did the salesmen and they received the same commissions. Morris had an office which the salesmen used in making sales, but they had no particularly assigned space, nor did any one of them have a desk exclusively for his own use. It was the practice of a salesman to bring his prospects to the office, or to ask them to call there. But Morris did not bear any of the expenses of the salesmen in selling, and the only compensation paid to them was a commission based upon the amount of the transaction. The salesmen furnished their own telephones and paid for their own stenographic work, stationery, postage, and business cards. At times, stenographers regularly employed by Morris worked at their own homes after regular hours for the salesmen; some salesmen employed other persons as secretaries. Telephone messages for salesmen were recorded by an employee of Morris and later given to them in writing or by telephone.

The salesmen carried cards bought by them bearing the words "State Development Company" and the address and telephone number of its place of business. However, Morris supplied the salesmen with contract blanks for use in making sales.

No sales instruction manuals or rules directing the manner in which the salesmen were to perform their duties were ever issued, but they were instructed not to make any misrepresentation concerning the property offered for sale. The salesmen were not required to be present at any specified place for any given number of hours. None of them agreed to continue with Morris for any definite period of time. No specific territory was assigned to any of them, and they were not required to follow any sales route, to adhere to any schedule of calls or to call upon any particular number of prospects. Each salesman obtained his own leads. At least three of the salesmen worked on transactions for the purchase or sale of land other than that owned or listed by Morris.

The salesmen were not required to submit, nor did they submit, any written report as to their activities for any given period of time. They were not required to report personally to the office of Morris or at any other place, nor were they required to make collections, investigations, or to perform any duties of that kind. They were not required to attend sales meetings, conferences, or consultations, and no such meetings were held. Salesmen wrote letters in regard to pending matters but Morris did not supervise their correspondence or sign the letters. They were not written in the name of "State Development Company" or "E. M. Morris" and the letterheads used did not bear either of these names.

Each salesman closed his own deals and he was authorized to receive the down payment from the prospect, but all sales were subject to confirmation by Morris within 10 days. Morris made no advances upon commissions. All amounts received from a purchaser were turned into the Morris office, which paid the salesman his commission. One-half of each installment payment was credited to the salesman until he had received his commission in full. Termination of the relationship did not terminate the salesman's rights to commissions. No salesman was ever discharged by Morris, but frequently a member of the selling staff, following a letter or other notice, would transfer his license to some other broker. Morris signed transfers of salesmen's licenses as a matter of courtesy.

Upon this evidence, the trial court found that the salesmen and the brokers were independent contractors, and as Morris had only one employee during the taxable period in controversy, he was not subject to the Unemployment Insurance Act.

The attorney general contends that the Unemployment Insurance Act is social legislation and as such must be liberally construed to the end that its purpose may be accomplished. The court may not accept the common law definition of master and servant as the measure of the relationship of the parties herein, he says, but must apply the definition which will accomplish the purposes for which the legislation was enacted. Under the statutory definition the salesmen and brokers performing services for Morris were "in employment." The attorney general also relies upon the requirements of the California Real Estate Act (Stats. 1919, p. 1252, as amended; Deering's Gen. Laws, 1937, Act 112; now Bus. & Prof. Code, §§ 10000-10221), and argues that its provisions clearly gave

Morris the right of control over the salesmen sufficient to meet all of the tests of an employer-employee relationship even under the common law. Finally, it is argued, there being no conflict in the evidence, as a matter of law, the salesmen and brokers working for Morris were his employees.

Morris takes the position that it was neither the intent nor the purpose of the Legislature to include an independent contractor within the purview of the Unemployment Insurance Act, and the common law concepts of independent contractor are controlling. The Real Estate Act was not promulgated for the purpose of establishing the status of employment so that either salesmen or brokers would be subject to and be benefited by the Unemployment Insurance Act. The respondent was selling his own property, consequently he was not a "broker" as that term is defined in the Real Estate Act and the parties were not governed by the terms of this legislation. Morris also asserts that real estate salesmen may or may not be independent contractors, depending upon the facts in each case. As requiring the affirmance of the judgment in his favor, Morris rests upon the findings and conclusions of the trial court which, he declares, are fully supported by the evidence.

The factors to be considered in making a determination as to whether, in a particular case, one performing services for another is an employee or an independent contractor have been fully stated by this court in recent decisions. Contributions to the Unemployment Insurance Act, it was held, may be assessed only upon amounts paid to employees; a principal for whom services are rendered by an independent contractor does not come within the scope of that legislation. (*Empire Star Mines Co.* v. *California Emp. Com., ante,* pp. 33, 43 [168 P.2d 686]; *Briggs* v. *California Emp. Com., ante,* pp. 50, 54 [168 P.2d 696]; *Twentieth etc. Lites* v. *California Dept. of Emp., ante,* pp. 56, 60 [168 P.2d 699].)

The Real Estate Act, *supra,* provides that a real estate broker is a person "who, for a compensation, sells or offers for sale . . . real estate . . . for another or others." (§ 2, now Bus. & Prof. Code, § 10131.) A real estate salesman is "one who for a compensation is employed by a licensed broker to sell, or offer for sale . . . real estate." (§ 2; now Bus. & Prof. Code, § 10132.) The act does not apply "to anyone who shall directly perform any of the acts aforesaid with

reference to his own property. . . ." (§ 2; now Bus. & Prof. Code, § 10133.) Both salesmen and brokers are required to establish that they are honest, truthful and of good reputation. (§§ 9, 9a, 9c; now Bus. & Prof. Code, §§ 10150, 10151, 10152, 10154.)

An applicant for a salesman's license is required to state in his application "the name and place of business of the person . . . then employing him, or in whose employ he is to enter." (§ 9a; now Bus. & Prof. Code, § 10151.) "The licenses of both broker and salesman shall be prominently displayed in the office of the real estate broker, and no license issued hereunder shall authorize the licensee to do business except from the location stipulated in the license. The salesman's license shall remain in the possession of the licensed broker employer until canceled or until said licensee shall leave the employ of said broker. Immediately upon the salesman's withdrawal from the employ of the broker, the broker shall return the salesman's license to the commissioner for cancellation. A license canceled but not suspended or revoked may be reinstated within the fiscal year upon receipt of application and fee of one dollar. . . ." (§ 11; now Bus. & Prof. Code, §§ 10160, 10161, 10162.)

Any person who acts as a real estate broker or a salesman without a license is guilty of a crime (§ 17; now Bus. & Prof. Code, § 10139.) It is also made unlawful for any licensed broker to pay any compensation to any person who is not a licensed broker, or a salesman licensed under the broker paying the compensation, or for any real estate salesman to be employed by or to accept compensation from any person other than the broker under whom he was at that time licensed. (§ 18; now Bus. & Prof. Code, § 10137.)

The Real Estate Act, *supra,* does not establish as a matter of law the status of every salesman as being "in employment" within the meaning of the Unemployment Insurance Act. The licensing statute was not promulgated for that purpose; it was designed for the protection of the public, the primary function being to allow only those persons to operate as real estate brokers and salesmen who are honest, truthful, and of good reputation. (*Riley* v. *Chambers,* 181 Cal. 589, 593 [185 P. 855, 8 A.L.R. 418]; *Gray* v. *Horne,* 48 Cal.App.2d 372 [119 P.2d 779]; *Koeberle* v. *Hotchkiss,* 8 Cal. App.2d 634, 640 [48 P.2d 104].) The act operates in a com-

paratively narrow field and the legislation should not be interpreted so as to give a meaning beyond its realm and scope. (See: Black on Interpretation of Laws, p. 66; Horack's Sutherland Statutory Construction (3d ed.), vol. 3, § 6006, p. 149.) The court of appeals of New York reached this conclusion in *Matter of Sullivan Co., Inc.*, 289 N.Y. 110 [44 N.E.2d 387], where the question presented for decision was "whether respondent, a corporation doing business as a real estate broker . . . is liable under the unemployment insurance law . . . to make contributions with respect to commissions earned by its salesmen." In that case, as here, reliance was placed upon legislation similar to, if not identical with, the provisions of the California statute. After observing that the purpose of the New York enactment was to insure competency and honesty of the licensee, the court held: "It is quite apparent that to effectuate the purposes of the statute [relating to licensing of real estate salesmen and brokers] . . . it is not necessary that we should go so far as to hold that the recognized common law relationship of independent contractor has been outlawed by the statute. No reason appears why the standards of competency and honesty among real estate salesmen cannot be maintained even though brokers have no control over the salesmen's selling methods. If the statute and the common law rule can stand together, the statute should not be so construed as to abolish the common law rule." (289 N.Y. 115.) Considering the facts as to the relationship of the parties, the court held that the broker was not liable for unemployment contributions because the real estate salesmen were independent contractors. And in *Koehler* v. *Myers*, 21 F.2d 596, where a statute requiring the licensing of real estate salesmen and brokers was construed, the court held that such legislation did not create a new definition of employer and employee.

The Real Estate Act of this state does not expressly give the employer the right to control the manner and means of accomplishing the result desired, nor do its provisions conclusively negative all of the other factors to be considered in determining whether one is an independent contractor. Accordingly, the occupation of real estate salesman, insofar as the Unemployment Insurance Act is concerned, is one that may be classified as that of an employee, or an independent contractor, depending upon the facts of the particular case. (*Peters* v. *California Building-Loan Assn.*, 116 Cal.App. 143

[2 P.2d 439]; *Royal Indemnity Co.* v. *Industrial Acc. Com.*, 104 Cal.App. 290 [285 P. 912]; *Hartford A. & I. Co.* v. *Industrial Acc. Com.*, 93 Cal.App. 313 [269 P. 733]; *Meyer & Co.* v. *Unemployment Comp. Com.*, 348 Mo. 147 [152 S.W.2d 184]; *Guaranty Mortgage Co.* v. *Bryant,* 179 Tenn. 579 [168 S.W.2d 182]; *J. G. Leinbach Co.* v. *Unemployment Comp. Bd. of Review,* 146 Pa.Super. 237 [22 A.2d 57].) Insofar as *Lowmiller* v. *Monroe, Lyon & Miller, Inc.,* 101 Cal.App. 147 [281 P. 433, 282 P. 537], is contrary to this conclusion, it is disapproved.

The evidence concerning the relationship of Morris and the brokers and salesmen working for him shows that he had no right to control, nor did he, in practice, control the manner and means by which the lots were sold. The salesmen were authorized to do business only from the location stipulated in the license and it was subject to cancellation if the licensee terminated his association with the Morris office, but the salesman could, with little difficulty, have the license reinstated. Also, a salesman could receive no compensation from any broker other than from Morris, but these factors merely present a conflict in the evidence in regard to the right of control and do not completely negative, as a matter of law, the possibility of an independent contractor relationship.

In the absence of an agreement for a definite term, the contract of employment was one at will and Morris had the right to discharge the salesmen at any time without cause. That right is strong evidence in support of an employment relationship (*Empire Star Mines Co.* v. *California Emp. Com., supra*), but it is not conclusive where other evidence supports the finding of the trial court that an independent contractor relationship exists between the parties. (*Counihan* v. *Lufstufka Bros. & Co.,* 118 Cal.App. 602, 605 [5 P.2d 694]; *Royal Indemnity Co.* v. *Industrial Acc. Com., supra,* p. 297; *Luckie* v. *Diamond Coal Co.,* 41 Cal.App. 468, 482 [183 P. 178].)

Although Morris allowed the salesmen to transact business in his office, he did not bear any of their expenses in selling his property, and the method of payment was by the job rather than by the time put in on the work. Each of them supplied the essential tools such as telephones, stenographic service, stationery, postage, and business cards, although Morris provided contract forms for their use. Under these

circumstances, the finding of an independent contractor relationship finds ample support in the evidence.

The judgment is affirmed.

Gibson, C. J., Shenk, J., Carter, J., Traynor, J., Schauer, J., and Spence, J., concurred.

Appellant's petition for a rehearing was denied October 10, 1946. Carter, J., and Traynor, J., voted for a rehearing.