Opinion
MOSK, J.
The Director of Employment (hereafter called the director) levied assessments against Lassie Television for unemployment insurance contributions assertedly due on the basis of salaries paid to writers who were employed to write television stories and plays. Such contributions are required only if the writers are employees rather than independent contractors. (Briggs v. California Emp. Com. (1946) 28 Cal.2d 50, 54 [168 P.2d 696].) Lassie filed a petition for reassessment with the Unemployment Insurance Appeals Board (hereafter called the board) contending that the writers were independent contractors. After a hearing, the referee found that they were employees and that the assessments were properly levied. The board reversed this determination. The director petitioned the superior court for a writ of mandate to reverse the board’s decision and to compel Lassie to pay the assessments. The trial court found that the writers were employees, and Lassie appeals from this determination.[1]
We hold that although the court, in determining that Lassie was an employer, improperly restricted its consideration to whether Lassie had the right to and did exercise control over the writers’ work, the conclusion of the court that the writers were employees nevertheless must be upheld.
The Unemployment Insurance Code[2] defines employment as service performed for wages or under a contract of hire. (§601.) The principal test of an employment relationship is whether the person to whom service is rendered has the right to control the manner and means of accomplishing the result desired. (Isenberg v. California Emp. Stab. Com. (1947) 30 Cal.2d 34, 39 [180 P.2d 11].) If control may be exercised only as to the result of the work and not the means by which it is accom *947 plished, an independent contractor relationship is established. (Moody v. Industrial Acc. Com. (1928) 204 Cal. 668, 670 [269 P. 542, 60 A.L.R. 299].) In applying these precepts to the circumstances of the present case the trial court concluded not only that Lassie had the right to control and direct the services of the writers under the terms of agreements entered into with them, but that Lassie in fact exercised its rights in this regard. The court did not consider other factors held to be relevant to a determination of employment status in Empire Star Mines Co. v. Cal. Emp. Com. (1946) 28 Cal.2d 33, 43-44 [168 P.2d 686],
Lassie was, at the times involved here, an independent producer of television films for use in broadcasts on commercial television. It did not write the stories for the films but acquired television rights thereto from free-lance writers. Prior to entering into a contract with Lassie a writer would conceive and develop his own ideas and present them for sale to Lassie or another producer. The initial presentation to Lassie could be either oral or in the form of a short written narrative. On some occasions the story as originally offered would be unacceptable to Lassie and the writer would make changes suggested by Lassie personnel. If Lassie was interested in purchasing the story it would contact the proposed commercial television sponsor to seek approval, and if such approval was obtained Lassie would enter into a contract with the writer for the purchase of the story and its fabrication into a teleplay. Prior to execution of the contract the relationship between Lassie and a writer was merely that of a prospective vendor and purchaser of literary property.
The contract provided that the “Producer [Lassie] hereby engages the Writer to render services in the writing, composition, preparation and revision of . . . literary material . . .” and that the “Writer accepts such employment and agrees to render his services hereunder and devote his best talents, efforts and abilities in accordance with the instructions and directions of the Producer.” It gave Lassie the right to discharge the writer if he became an object of public disgrace, if he was incapacitated for two weeks, if the production of the play was interrupted for four weeks for reasons beyond Lassie’s control, or if the writer refused or neglected to faithfully perform his duties. In the event such termination occurred, Lassie was required to pay only such compensation as was due at the time of discharge.
The contract also provided that it was subject to the Television Film Basic Agreement, hereinafter sometimes called the collective bargaining agreement. This agreement was negotiated after collective bargaining between the Writers Guild of America, West, Inc. and its eastern counter *948 part, on behalf of the writers involved here and other television writers, on the one hand, and the Alliance of Television Film Producers, Inc., of which Lassie was a member, on the other.
The agreement generally referred to the writers as employees. An employee was defined as “any writer who performs services for the Producer as a writer: (a) Whom the Producer has engaged ... to write ‘literary material’ . . . where the Producer has the right by contract to direct the performance of personal services in writing or preparing the literary material or in making revisions, modifications or changes; or (b) As to whom the Producer has by contract the right to direct the performance of personal services in making revisions, modifications or changes in ‘literary material.’ ” A writer was defined in the same manner.
The collective bargaining agreement distinguished between writers who were employees and those who were independent contractors.[3] It provided for a pension plan which was valid only if the writers were employees. (26 U.S.C. § 401.) The appropriate federal agency approved the pension program.
A distinct contract was executed for the writing of each play, the employment terminated when the play was completed, and a writer could only be compelled by the producer to make two drafts of a teleplay. He could be required to perform services at a location other than the studio of the producer, in which case the latter was to furnish accommodations and accident insurance.
After a contract with Lassie became operative the writer would prepare a teleplay. His first draft would be submitted to the story editor or another person in the employ of Lassie and frequently would be reviewed by other members of Lassie’s staff as well. Changes in the script were almost invariably required and Lassie would generally call the writer into the studio for the purpose of discussing these changes. The desires, suggestions, requests and directions of Lassie’s staff were in effect commands which had to be and were complied with by the writers if they could not convince Lassie that its suggested changes were inappropriate. Failure to comply would result in forfeiting future employment.
The writers worked on their own time, at their own expense, in their own way, with their own instrumentalities, and at a place of their own selection. Some writers had their offices at home and some maintained offices at other locations. The writers did not guarantee satisfactory results but were only required to use their talents and skills to the best of their *949 ability. There was no regularity or continuity in connection with successive engagements of the same writers and Lassie did not enjoy their exclusive services. They could and generally did enter into simultaneous and overlapping commitments with others. Some writers regarded their status as that of employees and others as independent contractors.
As we have seen, the trial court concluded that the contracts entered into between the writers and Lassie established that the writers were employees because they gave Lassie the right to control and direct the writers’ services and because Lassie exercised this right. It found the agreements free from ambiguity, fraud or mistake, and held that they were not a subterfuge to evade the payment of the tax or to shift the tax burden. Under these circumstances, concluded the trial court, it was not required to consider the applicability of other factors which were held in Empire Star Mines Co. v. Cal. Emp. Com., supra, 28 Cal.2d 33 to be relevant in determining whether a person is an employee or an independent contractor.
We first examine the trial court’s conclusion that the sole factor relevant to a determination of the writers’ status was whether Lassie had the right to control the details of their work under the agreements and whether this right was exercised. In Empire Star Mines this court, holding that a mining company was not an employer within the meaning of the Unemployment Insurance Act, said, “In determining whether one who performs services for another is an employee or an independent contractor, the most important factor is the right to control the manner and means of accomplishing the result desired. If the employer has the authority to exercise complete control, whether or not that right is exercised with respect to all details, an employer-employee relationship exists. Strong evidence in support of an employment relationship is the right to discharge at will, without cause. [Citations.] Other factors to be taken into consideration are (a) whether or not the one performing services is engaged in a distinct occupation or business; (b) the kind of occupation, with reference to whether, in the locality, the work is usually done under the direction of the principal or by a specialist without supervision; (c) the skill required in the particular occupation; (d) whether the principal or the workman supplies the instrumentalities, tools, and the place of work for the person doing the work; (e) the length of time for which the services are to be performed; (f) the method of payment, whether by the time or by the job; (g) whether or not the work is a part of the regular business of the principal; and (h) whether or not the parties believe they are creating the relationship of employer-employee. (Rest., Agency, § 220; Cal.Ann., § 220.)”
*950 A number of cases subsequent to Empire Star Mines also applied the multifactor test adopted therein. (See, e.g., Isenberg v. California Emp. Stab. Com., supra, 30 Cal.2d 34, 38-41; Tomlin v. California Emp. Com. (1947) 30 Cal.2d 118, 122-123 [180 P.2d 342]; Twentieth etc. Lites v. Cal. Dept. Emp. (1946) 28 Cal.2d 56, 60-61 [168 P.2d 699]; California Emp. Stab. Com. v. Morris (1946) 28 Cal.2d 812, 819-820 [172 P.2d 497].) These factors are set forth in the Restatement of Agency, .section 220, which has been revised since the above decisions to include two additional elements, i.e., the extent of control, and whether the principal is or is not in business.[4]
The right to control the means by which the work is accomplished is clearly the most significant test of the employment relationship and the other matters enumerated constitute merely “secondary elements.” (See Isenberg v. California Emp. Stab. Com., supra, 30 Cal.2d 34, 39.) These cases are in accord with federal decisions which, for the purpose of determining liability for federal unemployment insurance taxes, hold that the right to control and direct the individual who performs services as to the details and means by which the result is accomplished is the most important consideration but not the only element in determining whether an employment relationship has been created. (See United States v. W. M. Webb, Inc. (1970) 397 U.S. 179 [25 L.Ed.2d 207, 90 S.Ct. 850].)
We turn, then, to a discussion of these and other criteria. The director relies principally upon Isenberg v. California Emp. Stab. Com., *951 supra, 30 Cal.2d 34, the facts of which are in many respects similar to those in the present case. The Isenberg issue was whether free-lance jockeys were employees or independent contractors. The jockeys were employed separately for each race, there was no written employment agreement between them and the owners of the horses, and they were paid a specified amount if they lost a race and a larger amount if they won. They wore the silks of the owners but provided the balance of their riding equipment. Just prior to a race the owners would instruct the jockeys as to the running of the race and the handling of the horses but the nature of their instructions was limited by the rules of the California Racing Board. The jockeys were paid the contract price if they were discharged without cause.
Isenberg held that under these circumstances the jockeys were employees as a matter of law, reasoning as follows: The burden to show the absence of an employment relationship was upon the owners who were attempting to disprove the relationship. The owners failed to meet this burden in that they did not demonstrate absence of the right to control the jockeys. The evidence of custom in the industry indicated the owners could control the performance of the jockeys except as limited by the rules of the racing board. As to the question of termination, the jockeys could be discharged at any time before the race provided that if they were discharged without cause the owners were required to pay the contract price. Three of the elements set forth in Empire Star Mines as indicating an employment relationship were absent (jockeys were skilled workmen, they were employed for only one race, and the basis of payment was not the time involved). The other elements were either present or were irrelevant.[5] It was concluded that where the facts are without conflict, existence of an employment relationship is a question of law.
In neither Empire Star Mines nor Isenberg was there an agreement *952 between the purported employer and employee setting forth the details of their relationship. Such agreements are a significant factor for consideration, and the trial court was correct in relying upon them here. Not only did both agreements give Lassie the right to direct the writers in making modifications or revisions in their teleplays, but the collective bargaining agreement referred to the writers as employees throughout and contained other provisions, such as those relating to the pension plan, which would be appropriate only if the writers were employees. There is a strong implication from this language that Lassie had the right to control the manner in which the writers made these changes.
We recognize that the terminology used in an agreement is not conclusive, however, even in the absence of fraud or mistake. In Bartels v. Birmingham (1947) 332 U.S. 126 [91 L.Ed. 1947, 67 S.Ct. 1547, 172 A.L.R. 317], a collective bargaining agreement recited that ballroom operators were the employers of musicians in a band and that the “employer shall at all times have complete control of the services which the employees will render. ...” The evidence showed, however, that the bandleader exercised complete control over the musicians. The Supreme Court held the fact that the contract gave the operators the “right” to control the musicians was not conclusive, and that the bandleaders rather than the ballroom operators were in fact the employers of the musicians. This holding was followed in Mark Hopkins Inc. v. Cal. Emp. etc. Com. (1948) 86 Cal.App.2d 15 [193 P.2d 792].[6]
The trial court here did not rely solely upon the provisions of the contract but held that Lassie in fact exercised control and direction over the writers. There is substantial evidence to support this finding of fact.
The evidence establishes that revisions in the first draft of a teleplay were almost always necessary. When these were to be made, the writer usually went to Lassie’s office to discuss the matter with the story editor or a producer on the staff of Lassie. These conferences on occasion lasted as long as a day and in some instances changes would be required on almost every page of a script. These revisions, “directed” by Lassie’s personnel, included elimination or alteration of dialogue, as well as changes in the motions of the actors, the setting of the play, the types of animals to be employed, and the removal of scenes which might be objectionable to the commercial sponsor. This evidence is clearly sufficient to *953 show that Lassie exercised considerable control over the manner and means by which a writer fabricated a teleplay from a story.[7]
The trial court did not discuss the secondary factors enumerated in Empire Star Mines and the Restatement. An analysis of the record shows that some of these factors point to a conclusion that the writers were employees, others reflect an independent contractor relationship, while still others are irrelevant under the circumstances or are not conclusively established either way by the evidence.
Of the factors enumerated in the Restatement aside from the right of control, an employment relationship is indicated by the circumstances that Lassie is in business (Rest. 2d Agency, § 220, subd. (j)), and that the supervision of writers in changing a story into a teleplay is a part of its regular business (subd. (h)).[8]
That the writers are engaged in a distinct occupation (subd. (b)), that their work involves skill (subd. (d)), that they do not work on Lassie’s premises (subd. (e)), that they are employed only to write a particular play (subd. (f)), and that they are paid by the job rather than by the hour (subd. (g)), would appear to suggest an independent contractor relationship. However, the persuasiveness of such a conclusion is severely diminished by the overriding fact that most of these elements are relevant primarily for the purpose of indicating that the alleged employer exercises control over the manner and means by which the work is accomplished. (See com. i and j on subsection (2), pp. 489-490.) These factors are merly evidentiary indicia of the right to control. Where, as here, there is ample independent evidence that the employer has the right to control the actual details of the writers’ work and that it exercises this right, the fact that, for example, the employee is paid by the job rather than by the hour appears to be of minute consequence.
The question of the ownership of instrumentalities or tools (subd. (e)) is likewise of little relevance here. Such ownership is significant *954 “especially if [the tools] are of substantial value,” to indicate that the alleged servant will follow “the directions of the owner in their use.” (Rest. 2d Agency, com. k on subsection (2), pp. 490-491.) The only “instrumentalities” utilized by the writers are a typewriter and paper, which illustrate that the factor of ownership of tools is of little importance where the service to be performed is an intellectual endeavor.
The evidence is in conflict as to whether the parties believed they were creating the relationship of master and servant (subd. (i)). Some of the writers considered themselves to be employees and others deemed themselves to be independent contractors; this same variance was reflected in the views of Lassie and other producers. There appears to have been no clear evidence at the hearing involving the Lassie assessment as to whether the writers in the locality generally worked under the direction of the producers or without supervision (subd. (c)). However, the evidence at the consolidated hearing relating to Filmaster’s liability for the tax indicates that company exercised considerable control over the details of the work of the writers it employed.
Lassie cites a number of decisions holding that an independent contractor relationship was established under various circumstances. (E.g., California Emp. Stab. Com. v. Morris, supra, 28 Cal.2d 812; Moody v. Industrial Acc. Com., supra, 204 Cal. 668; California Emp. Stab. Com. v. Wirta (1946) 75 Cal.App.2d 739 [171 P.2d 728]; Brosius v. Orpheum Theater Co. (1936) 16 Cal.App.2d 61 [60 P.2d 156].) We find these cases of little assistance, since each is distinguishable factually from the instant problem.
Empire Star Mines indicates that strong evidence in support of an employment relationship is the right to discharge at will, without cause (28 Cal.2d at p. 43). Such evidence is of little value where, as here, the employer’s right to terminate the relationship is limited by agreement. Virtually all collective bargaining agreements covering workers who are unquestionably classified as employees contain a provision restricting management’s right to discharge and, indeed, a provision prohibiting discharge without just cause is frequently read into the agreement by inference even if textually omitted. (Labor Law (Cont.Ed.Bar) p. 201.)
It should be noted parenthetically that after the board’s decision here the Unemployment Insurance Code was amended by the Legislature to provide that the term “ ‘employment’ includes any service in an artistic or literary capacity performed by an individual pursuant to a collective bargaining agreement . . . where the employer has the right to control and direct the services to be performed and the individual is defined as an *955 employee under the terms of the collective bargaining agreement.” (§ 601.5.)
The director argues that this provision is declarative of the law which existed prior to its enactment while Lassie contends that the enactment effected a change in the law. We need not resolve this academic exercise in view of our conclusion under the circumstances of this case that an employment relationship existed between Lassie and the writers.
The judgment is affirmed.
Burke, Acting C. J., McComb, J., Peters, J., Tobriner, J., Sullivan, J., and Roth, J.,* concurred.

This case originally involved another company, Filmaster, Inc., which also employed television writers. The proceedings against the two companies were consolidated before the trial court. The court found against both Lassie and Filmaster, Inc., but apparently only Lassie has appealed from the judgment.

All references will be to the Unemployment Insurance Code unless otherwise noted.

Article III-B provided that ,a writer under the agreement was not to be retained to create basic format, theme or characterizations, but that the producer had the right to utilize independent contractors for this purpose.

The text of section 220 of the Restatement Second of' Agency is as follows:
“(1) A servant is a person employed to perform services in the affairs of another and who with respect to the physical conduct in the performance of the services is subject to the other’s control or right to control.
“(2) In determining whether one acting for another is a servant or an independent contractor, the following matters of fact, among others, are considered: “(a) the extent of control which, by the agreement, the master may exercise over the details of the work;
“(b) whether or not the one employed is engaged in a distinct occupation or business;
“(c) the kind of occupation, with reference to whether, in the locality, the work is usually done under the direction of the employer or by a specialist without supervision;
“(d) the skill required in the particular occupation;
“(e) whether the employer or the workman supplies the instrumentalities, tools, and the place of work for the person doing the work;
“(f) the length of time for which the person is employed;
“(g) the method of payment, whether by the time or by the job;
“(h) whether or not the work is a part of the regular business of the employer; “(i) whether or not the parties believe they are creating the relation of master and servant; and
“(j) whether the principal is or is not in business.”

The court stated, “The other elements are either present or inapplicable to this case: (a) The occupation is an integral part of the owner’s business, (b) The work is usually performed under the direction of the owner or trainer to the extent allowed by the rules of the California Horse Racing Board. . . . (d) Although the jockey furnishes his personal riding equipment the silks and the horse are furnished by the owner. . . . (g) The question whether horse racing is the regular business or occupation of owners of race horses is immaterial in determining whether jockeys are employees. The plaintiff made no showing that it was not his regular occupation and testified that he could not say what his regular occupation was. (h) The belief of the parties as to the relationship created is relevant only to indicate whether or not there was an assumption of control by the principal and submission thereto by the worker. (Rest., Agency, § 220, com. (i).) There was no evidence in regard to the belief of the parties as to their relationship at the time the services were performed. The belief of the jockeys, however, that they would not be rehired if they failed to follow instructions is relevant to show their submission to control.” (Isenberg v. California Emp. Stab. Com., supra, 30 Cal.2d 34, 39-40.)

 Amici curiae who have filed a brief on behalf of the director attempt to distinguish the Mark Hopkins case upon the ground that the case did not turn upon whether the musicians were employees or not but upon who was liable for the taxes as “the true employer.” While this may be true, that decision, as well as Bartels, nevertheless stands for the proposition that the mere recitation in a collective bargaining agreement that a person has the right to control the services rendered by another is not conclusive.

Lassie relies upon the following finding made by the trial court: “In the first instant, generally [the writer] w.as expected to use his own methods and means of adapting the literary material into a product satisfactory for the producer’s specialized purposes.” (Italics added.) This finding must relate to the stage of a writer’s work in which he is writing the story he desires to sell to Lassie before a contract has been entered into. The italicized phrase so indicates and such an intepretation is consistent with the trial court’s finding that an employment relationship existed between Lassie and the writers.

 The trial court found that Lassie was not in the business of writing stories but it was undeniably in the business of supervising the writing of teleplays from stories purchased from the writers.

Assigned by the Acting Chairman of the Judicial Council.