[S. F. Nos. 17283, 17284. In Bank. May 16, 1947.]

C. H. TOMLIN et al., Appellants, v. CALIFORNIA EMPLOYMENT COMMISSION, Respondent.

(Two cases.)

B. E. Kragen, Lionel B. Benas and Hillard Goldstein for Appellants.

Robert W. Kenny and Fred N. Howser, Attorneys General, and Clarence A. Linn and Doris H. Maier, Deputy Attorneys General, for Respondent.

EDMONDS, J.—C. H. Tomlin and several partners, doing business as Rex Novelty Company, sued to recover contributions paid under the Unemployment Insurance Act (Stats. 1935, p. 1226, as amended; 3 Deering's Gen. Laws, Act 8780d). They contend that certain persons, who placed and serviced amusement vending machines owned by the partnership, were independent contractors rather than employees. A consolidated appeal from separate judgments in favor of the commission presents for determination the question as to the relationship of the partners and these persons.

Pursuant to the demands of the commission, the partnership paid the sums of $809.40 and $7,027.80 under a verified protest in writing. These amounts represented contributions, interest, and penalties alleged by the commission to be due under the Unemployment Insurance Act with respect to compensation paid to the persons whose status is now in controversy during the years 1938 through 1942, inclusive.

Notice of assessment of delinquent contributions was served on the partners by the commission, and thereafter they filed a petition for reassessment with a request for a hearing as provided in section 45.5 of the Unemployment Insurance Act. A referee found in favor of the commission. The appeals board created by the statute approved the assessment and denied the petition for reassessment. The present actions were then instituted to recover the amounts paid. Upon a trial, the court held that the partners were employers and rendered judgments in favor of the commission.

During the taxable period for which contributions were levied, the partnership owned approximately 450 "crane," "claw," or "digger-type" amusement vending machines. These machines were placed in desirable locations for the use of the public by the men who, the commission asserts, were the employees of the partnership. The partnership stands upon the terms of a "lease agreement" giving each of such persons, termed a "lessee," the right to place and service a specified number of the machines.

Under the terms of this contract, which was a standard form used by the partnership in its operations, each "lessee" agreed to obtain locations for the machines delivered to him. At intervals, the "lessee," or person employed by him, termed an "operator," collected the money deposited by the public, stocked the machine with merchandise to be delivered to the users, and generally serviced the mechanism. The amounts taken in by the machines, after deducting the cost of the merchandise, were divided upon an agreed percentage basis among the location owners, the partnership and the "lessees."

By the terms of the contract, the "lessee" agreed that, at the expiration of the specified term, he would deliver to the partnership, in good condition, the machines entrusted to him. The partnership might take delivery at the place where a machine was located. The partners were to pay all licenses and taxes imposed upon the operation of the machines.

A further provision of the agreement was that the "lessee" was not to purchase, rent, or operate any other coin operated merchandise vending machine. The "lessee" bound himself to devote his time exclusively to the operation of the partnership's machines, unless the parties otherwise agreed in writing. By express terms, it was stipulated that the contract was one of rental only, and should not be construed as creating the legal relationship of partnership, agency or employer-employee. The partnership was not to be liable for any of the "lessee's" losses, the parties also declared. The "lessee" agreed to procure insurance, at his own expense, against property damage and public liability, and to save the partners harmless from any damage in this respect arising out of the operation of the machines by him. No term was specified for the relationship to continue, and the contract could be terminated by either party upon notice in writing.

Notwithstanding the provisions of the contract, some of the "lessees" engaged in other businesses with the partners' knowledge and consent, and operated machines belonging to

themselves or to other companies. As a matter of practice, the contracts were terminable upon 30 days' notice. Also, some of the "lessees" did not divide the net income from the machines in accordance with the percentage fixed by the agreement, but paid the location owners on a different basis and divided the balance equally between themselves and the novelty company.

Prior to making such a contract, the partners determined if the proposed "lessee" was a responsible person, knew the business, and could operate machines with profit to the owners. The "lessee's" activities were confined to a particular area, and he was required to submit weekly reports to the partnership showing the names of each of the operators working for him, the location of the machines, the amount of money collected from the particular location, the amounts paid to the various operators, and the expenses deducted for the maintenance of the route. The operator was required to secure a signed receipt from the location owner when he made his collection. This receipt was given to the "lessee," who remitted it to the partnership with his weekly report.

From time to time, a representative of the partners visited the territories in which the machines were located for the purpose of checking the location of them and determining that they were in establishments which afforded protection for the investment of the owners. The representative "would talk to different lessees and exchange ideas with them." Occasionally, the partners held meetings at which the "lessees" and the operators were present. Discussions were held by representatives of the partnership concerning methods of improving collections, and ideas were exchanged in regard to the operation of the business. A "lessee" could sell his route, but the partners had the right to pass upon the qualifications of the proposed "lessee." Norman Pope, a partner in the Rex Novelty Company, testified that if it was determined from the weekly report that there was not sufficient income from a particular location, or that there was any danger of losing the equipment, the "lessee" was advised to change the location or to send the machine back to the company.

The record includes testimony that the "lessees" selected their own employees, called operators, and regulated their hours of work. Although one of the "lessees" testified that he consulted with the partnership when he employed an operator, he was not required to do so. The "lessees" were not

required "to put in any particular amount of time." And there is evidence that the partners did not fix the wages of the operators, regulate the nature of their work, or have anything to do with the employment of them.

The "lessees" performed minor repairs on the machines, according to Pope, but if a major repair was necessary, a new machine was substituted by the company and the defective one was returned. Although the partners bore all the risk of loss of a machine because of a fine or confiscation, the "lessee" was held responsible for the cost of the merchandise placed in the machine. This merchandise was charged to the "lessee" upon an inventory taken when the machine left the Rex shop.

On occasion when the "lessees" opened new territory they were given financial assistance by the company in the form of a drawing account. The amount was usually, but not invariably, repaid from the "lessee's" percentage of the profits. The telephone, in most instances, was listed under the name of "Rex Novelty Company," and in some cases, the company shared the telephone expenses. Garage rents, legal fees, the expense of licenses for new machines, and the cost of association stickers were also shared. However, the "lessee" assumed other business charges. The automobile or other transportation used by the "lessees" or their operators was furnished by the "lessees," who paid the expenses of operation.

Upon this evidence, in each action the trial court found that the "lessees" "rendered services to plaintiffs under a contract of hire and for wages and were subject to plaintiffs' authoritative control." As conclusions of law, the court held "that the individuals performing services for the plaintiffs in the plaintiffs' business of operation crane or digger-type machines were in plaintiffs' employ," and that the partnership was not entitled to a refund of the amounts paid for contributions required by the Unemployment Insurance Act. Judgments were entered accordingly, and separate motions for a new trial were denied.

■ Under recent decisions, the relationship contemplated by the Unemployment Insurance Act has been held to be that of employer and employee, an independent contractor not being within the scope of its provisions. As stated in those cases, the most important factor in determining whether a person is an employee or independent contractor, is the *right* to control the manner and means of accomplishing the result

desired. Strong evidence in support of a finding of control is the right to discharge at will, without cause. Other factors, enumerated in the Restatement of Agency (§ 220), are also to be taken into consideration in determining the type of relationship that exists. (*California Emp. Stab. Com.* v. *Norins Realty Co.,* 29 Cal.2d 419 [175 P.2d 217] ; *California Emp. Stab. Com.* v. *Morris,* 28 Cal.2d 812 [172 P.2d 497] ; *Twentieth etc. Lites* v. *California Dept. of Emp.,* 28 Cal.2d 56 [168 P.2d 699] ; *Briggs* v. *California Emp. Com.,* 28 Cal.2d 50 [168 P.2d 696] ; *Empire Star Mines Co.* v. *California Emp. Com.,* 28 Cal.2d 33 [168 P.2d 686].)

 In the present case, there is evidence to support the finding of the trial court that the partners had the right to control the manner and means of accomplishing the result desired. The partners might, under the written agreement, terminate the relationship at any time, without cause, and by threatening to recall the machines, could control the "lessees' " activities. The work of the "lessees" and their operators was checked at frequent intervals through the weekly reports, the visits of a company representative, and by means of company meetings. Some of the other factors which create the relationship of employer-employee were also present. The "lessees" were not engaged in a distinct occupation or business and their services constituted an integral part of the business operations of the novelty company. The principal instrumentality, the vending machine, was supplied by the partnership. The existence of these factors fully justifies a determination of an employer-employee relationship.

The judgments are affirmed.

Gibson, C. J., Shenk, J., Carter, J., Traynor, J., Schauer, J., and Spence, J., concurred.