[Civ. No. 14771. First Dist., Div. One. Feb. 15, 1952.]

K. E. BEMIS et al., Appellants, v. THE PEOPLE, Respondent.

[Civ. No. 14772. First Dist., Div. One. Feb. 15, 1952.]

FRED L. BEMIS et al., Appellants, v. THE PEOPLE, Respondent.

[Civ. No. 14773. First Dist., Div. One. Feb. 15, 1952.]

K. E. BEMIS et al., Appellants, v. THE PEOPLE, Respondent.

254

Joseph A. Murphy and Breed, Robinson & Stewart for Appellants.

Edmund G. Brown, Attorney General, Irving H. Perluss and William L. Shaw, Deputy Attorneys General, for Respondent.

PETERS, P. J.—Prior to December 31, 1937, appellants as partners, under identical master leases, operated a chain of 28 restaurants in the bay area under the name "White Log Coffee Shops." After that date the appellants sublet each of their locations to individuals or groups of individuals, who, for the most part, had been prior employees of appellants. Other contracts, hereafter described, were entered into by the sublessees. The question arose whether these sublessees were employees of the appellants, and so subject to the terms of the Unemployment Insurance Act, or were independent contractors. The department ultimately ruled that the sublessees were, in fact, employees of appellants, and so subject to the terms of the act. The appellants, under protest, paid the taxes, without interest or penalties, and then instituted three separate actions to recover them. The respondent state cross-complained for the unpaid interest, having waived the penalties. The three actions were consolidated, tried upon stipulations of facts, and the introduction of some evidence.

It was also stipulated that, for the purposes of briefs and arguments, appellants in all three actions should be called "Bemis Enterprise." The trial court determined that an employer-employee relationship existed, that appellants were subject to the tax, and the state was entitled to interest. Bemis Enterprise appeals, contending that the finding of employment is unsupported and that the evidence demonstrates, as a matter of law, that the sublessees were independent contractors and not employees. No point is made as to the computation of the taxes or interest, it being stipulated that the tax period and the amount of the tax and interest as computed by the state is correct.

### Detailed Facts

Prior to December 31, 1937, Bemis Enterprise operated, under three partnerships, 28 restaurants known as White Log Coffee Shops. One group was run under the name of White Log Systems, the individual partners being K. E. Bemis and R. L. Bemis; another group was run under the name of National Restaurant System, the individual partners being K. E. Bemis, R. L. Bemis, Fred L. Bemis, K. W. Bemis and B. Bemis Bilyeu; while the third group was operated under the name of Concord Company, the individual partners being Fred L. Bemis, K. W. Bemis and B. Bemis Bilyeu. These partnerships leased the various premises on which restaurants were located under identical leases referred to by the parties as "master leases." The rental, under the master lease, was a percentage of sales with a fixed minimum and maximum. The lessees—Bemis Enterprise—were required to keep the premises in good condition and repair, maintain them in a clean and sanitary condition, to operate the restaurants with a fixed customer capacity, a fixed number of hours per week, to offer for sale its regular line of beverages and sandwiches and other foods, to install a standard type of cash register and use diligence to cause the employees to ring up all sales, to keep accurate records of sales, and to furnish monthly statements to the landlord, and to allow the lessor to examine the books and records of sales of the lessees. These master leases gave the lessees, any time after one year from their respective dates, the conditional option to terminate the lease upon 60 days' notice, and gave the lessor the conditional right to terminate upon 90 days' notice.

Prior to January 1, 1938, Bemis Enterprise began negotiating with their employees in reference to these restaurants,

and ultimately negotiated, in respect to each location, a series of agreements. These agreements became effective January 1, 1938, and thereafter. In negotiating these agreements it is stipulated that "preference . . . was given to former employees" of Bemis Enterprise. How many of these agreements, if any, were negotiated with persons not formerly employees does not appear. As to each location a series of agreements were entered into.

The first is a lease between Bemis Enterprise, as lessor, and former employees, or others, as lessees. It is referred to as the "Sub-Lease." It covers only the premises involved and does not cover the building or its equipment. This document requires the leased premises to be maintained by the sublessees as a coffee shop, requires the sublessees to secure and pay for public liability insurance of the type and in the amount approved by the lessor, and has similar provisions to those contained in the master lease as to hours of operation, food to be sold, cash register, keeping and inspection of records, etc. The rental under the sublease was a fixed proportion of sales on a sliding scale. The sublessees agreed to keep the premises in a clean and sanitary condition, to keep the equipment in repair and to replace lost, broken or damaged equipment, and to require each partner or employee to be courteous to customers and to serve them efficiently. Either the sublessees or the lessor could terminate on 30 days' written notice. Bemis Enterprise was given a right of entry at all times. The sublease was expressly made subject to the performance of the master lease, and the sublessees covenanted not to do any act that would constitute a breach of the master lease, and were expressly prohibited from recording the sublease. The sublessees were prohibited from assigning or transferring the sublease without the consent of the lessor. It was also provided that if any of the partner lessees should withdraw from the partnership "then no leasehold interest herein granted shall inure to the individual benefit of any of the above named partners and this lease shall then be of no further force or effect."

If more than one former employee became the sublessee, a partnership agreement between the sublessees was entered into by a form agreement printed and furnished by Bemis Enterprise. The form provides for a capital contribution by the partners. It was stipulated "that from time to time lessees entered into partnership agreements and executed leases with lessors and commenced operation of a coffee shop without making any capital contribution to the partnership,

other than required license fees; and . . . that from time to time partnership operating such coffee shops and existing between the lessees were dissolved without the formality of a written agreement so to do, and on some occasions were dissolved by remaining partners where one partner would abandon the enterprise, without notice.'' The reporter's transcript also shows that the parties stipulated that the sublessees also advanced the amount of change kept in the cash registers. These are the only ''capital contributions'' shown by the record.

Simultaneously with the execution of the sublease, an equipment lease was also executed between National Restaurant System as lessor and the sublessees. This constituted a lease of the log cabin building and all of the equipment contained therein. The equipment lease provides for a percentage rental dependent upon sales, and a fixed charge for all utilities. This equipment lease also contained most of the provisions above summarized that were contained in the sublease.

After the execution of the sublease and the equipment lease, and, where applicable, the partnership agreement, the sublessees at each location entered into three other agreements.

The first of these was a ''Trust Agreement,'' in which one George Hazlett was appointed trustee. Prior to January 1, 1938, Hazlett had been an employee of Pacific States Wholesale Company, and one of its original incorporators. That company had been incorporated in July, 1936, and prior to January 1, 1938, served only those restaurants operated by National Restaurant System. When incorporated, K. E. and Ruth L. Bemis owned the controlling interest. On January 1, 1940, these interests were transferred to N. J. Kirk as trustee for W. E. and Georgia E. Bemis.

· The trust agreement provides that title to all gross receipts from sales made in each of the coffee shops (excepting wages paid to employees of the sublessees) is vested and shall remain in the trustee. It required such receipts to be delivered daily to the trustee to be held by him for the use and benefit of the sublessees, subject to certain conditions. These conditions included the payment of taxes, insurance, bills, rentals provided by the sublease and equipment lease and other expenses of the operating lessees. The receipts were banked by the trustee under his name. The agreement further required that each Saturday the trustee should pay to each of the sublessees a fixed sum, designated as an advance on anticipated profits.

The trust agreement contemplated that the sublessees would have an accountant service, and that such accountant would render periodical profit and loss statements. It provided that within 10 days of the receipt of such statement the trustee should pay to the sublessees the net profit shown on such statement, less the amounts already paid to them, and less any obligations shown to exist. The trustee was to receive a stipulated fee for his services. The trust was made irrevocable, and terminable upon dissolution of any of the partnerships. Hazlett had his office in the same building that housed the National Restaurant System and the Pacific States Wholesale Company, where he paid but a nominal rent for one room.

The second agreement executed by all sublessees was an "Accounting Agreement" with G. L. Hornstein Company, which was G. L. Hornstein doing business as a C.P.A. under that name. It was stipulated that "practically all" of Hornstein's income was derived from the fees provided for in the accounting agreement with the sublessees, and fees paid him by National Restaurant System and Pacific States Wholesale Company. He had his office in the same building as did Hazlett where he, too, paid nominal rent for one room. Under the terms of this accounting agreement Hornstein, for a fixed fee of $4.75 per week, agreed with the sublessees at each location to furnish all necessary forms and books, to check all charges, to prepare government reports, and, in short, to render a full accounting service. As already pointed out, on the basis of Hornstein's reports, the trustee disbursed the gross receipts received by him.

The third contract executed by all sublessees was a so-called "Service Agreement" entered into with Pacific States Wholesale Company, referred to as "wholesaler," whereby that company, for a fee, agreed to render certain services to the subtenants. Among other things, the service agreement provided that the wholesaler would furnish painted advertising posters and signs at designated periods, furnish menus, and maintain a food and equipment warehouse which stocked commodities used in the coffee shops, excepting dairy and bakery products and some meat products. The wholesaler also agreed to assist the partnerships, by means of advice and recommendations in the preparation and handling of foods, to negotiate for best prices obtainable on products not maintained in the warehouse and to repurchase unused supplies, in good and salable condition. On the other hand, the partnerships were not bound to buy all or any of their merchandise from or through the

wholesaler, but could buy elsewhere if desired. The wholesaler also agreed to have its trained experts make frequent calls at the coffee shops to advise and assist. The stipulation states that, pursuant to the service agreement, service men who were employees of wholesaler, performed the following services under the agreement during the existence of the lease operation:

(1) Visited each of the leased locations at least once in each 24-hour period, and often twice during such period. Such visits were not at any fixed time;

(2) Visited the leased locations during rush hours from time to time to observe the manner in which service was rendered, and thereafter made comments and suggestions in reference to improvement of same;

(3) Discussed with the partners and their employees the appearance of their hands and aprons and commented upon the fact that cleanliness was an important element of salesmanship in a coffee shop;

(4) Tasted food and made suggestions on appearance of such on service plates, and on seasoning of food;

(5) During the latter part of 1940 and early 1941, when the labor supply became acute, these service men would assist the partners in obtaining help, and in training new help. Frequently the service men would anticipate the need for help and would bring replacements to the coffee shops without the solicitation of the partners;

(6) The service men would frequently demonstrate to new employees of the partners the technique of serving food and meeting the public, etc.;

(7) The service men commented upon the appearance of the pots, pans, cutlery and ranges in the coffee shops, and discussed with the partners the best way of cleaning and polishing them;

(8) The service men were frequently requested by the partners to secure substitute partners for those who were about to leave, or had left the individual partnerships, and frequently produced men as substitute partners who proved to be satisfactory to the remainder of the partners on the lease; and the

(9) Service men would frequently be called upon by the partners for the purpose of aid in solving the "change" problem in the cash registers.

These, then, were the documents executed by the various parties. Bemis Enterprise, as such, was a party to the master lease and to the sublease. The equipment lease was between

the sublessees and the National Restaurant System, a Bemis controlled company. The service agreement was between the sublessees and Pacific States Wholesale Company, a Bemis controlled company. The trust agreement was between the sublessees and Hazlett, a former employee of Pacific States Wholesale Company, and who maintained his office, paying but a nominal rent, in the same building as Pacific and the National Restaurant System. The accounting agreement was between the sublessees and Hornstein, the latter deriving practically his entire income from fees paid by the sublessees and the Pacific and National companies. He had an office in the same building as did Hazlett, and he, too, paid but a nominal rent. The partnership agreements were executed on forms supplied by Bemis Enterprise, and were between the respective sublessees at each location where there was more than one sublessee.

There are some other facts to which reference should be made. It was stipulated that Bemis Enterprise furnished the sublessees with printed form certificates required to qualify a partnership under California law, and that Bemis Enterprise furnished the subtenants, when available, a standard type of cap and apron. It was further stipulated that the same type of service was continued at each location sublet, except that at some locations the subtenants added new items of food, candy or soft drinks. After the subleases were executed, neither the exterior nor the interior of the buildings was changed, and each building carried the name "White Log Coffee Shop." Each location had a small sign on the cash register which contained the names of the subtenants who operated that location, and the state and city licenses issued to the subtenants.

After operations had commenced under these agreements a question arose with the State Department of Employment as to whether the sublessees were employees of Bemis Enterprise or were independent contractors within the meaning of the California Unemployment Insurance Act. Copies of the various contracts were submitted to that department. Under date of February 2, 1939, the executive director of the department wrote a letter to K. E. Bemis analyzing each agreement and the entire operation. The letter concludes that each of the "White Log Coffee Shops is operated by a bona fide partnership. The partners, therefore, would not be employees of any of the related corporations or partnerships in which you are interested, but would themselves be employing units . . .

Although there appears to be some measure of control and direction exercised over each of the partnerships through the medium of the several agreements, we believe that such control and direction as may exist relates more to the obtaining of a result rather than the manner and means of its accomplishment.

"Many of the provisions of the various agreements which ostensibly delegate the right to control the operation of the coffee shops in reality are satisfactorily explained by the circumstances that the co-partners are not required to conduct themselves in a certain manner but do so because of the mutual advantages to be gained from the arrangements."

The letter specifically states that the ruling is conditional, and that the right to reconsider is reserved, in case any individual affected by the opinion files a claim and proves that he is entitled to recover under the Unemployment Reserves Act, or in the event that the Bureau of Internal Revenue should make a ruling different from the one made by the state.

The federal government, subsequently, did make a ruling contrary to that of the state by a letter dated October 27, 1941, and signed by a deputy commissioner of the treasury department. This letter discusses the background of the agreements and analyzes each of them. The essence of the analysis is that Bemis Enterprise retains sufficient control to make the sublessees employees. It is pointed out that, although there is no contractual obligation to enter into the trust, accounting and service agreements, all of the sublessees entered into such agreements, and that, although the sublessees are not required by the service agreement to purchase their supplies through Pacific States Wholesale Company, and are not required by any contract to execute the accounting or trust agreements, all of the sublessees have uniformly purchased through Pacific and have executed the trust and accounting agreements. The letter also points out that the provision in the printed partnership agreement for capital contributions by the partners is purely formal, as no substantial capital was put up by any partner. The letter analyzes the relationship that Hornstein and Hazlett bore to Bemis Enterprise, and also points out that all subleases are terminable by the Bemis Enterprise. The letter concludes: "It is held, on the basis of the foregoing facts, that the 'lessees' of White Log Coffee Shops are employees of the National Restaurant System and its predecessor organization for purposes of . . . the Social Security Act . . . Accordingly, the System and the predecessor organization

have incurred liability for the taxes imposed . . . with respect to the wages of the 'lessees' . . . in the operation of the restaurants.''

On November 18, 1941, or prior thereto, the supervising auditor of the State Department of Employment notified a representative of Bemis Enterprise that he was of the opinion that Bemis Enterprise was subject to the state tax. He stated, however, that he would recommend an abatement of penalties, and also stated that the opinion contained in the letter from the department that Bemis Enterprise was not subject to the tax was ''practically ridiculous.'' These conversations were subsequent to the federal ruling of October 27, 1941, but prior to the date that the state had notice of the federal ruling, which notice the state did not receive until January, 1942.

On this evidence the trial court found that the persons operating the restaurants were not lessees of Bemis Enterprise, but were employees; that the sublease and equipment lease were not bona fide leases that created a leasehold interest between the parties, but that they were so interpreted and applied between the parties so that an employment relationship existed between them; that the trust, accounting and service agreements were, in intent and effect, designed to apply the control of Bemis Enterprise over the personnel operating the coffee shops; that the service men provided for in the service agreement were employees of Bemis Enterprise and inspected and supervised, on a daily basis, the premises and personnel operating the shops for the purpose of applying the control existing in Bemis Enterprise over such personnel.

*The Finding That Bemis Enterprise Was the Employer of Those Operating the Restaurants Is Supported by the Record*

Before directly discussing the facts, reference should be made to several legal principles that are applicable to the problem presented.

The statute involved is the Unemployment Insurance Act. (Deering's Gen. Laws, Act 8780d; Stats. 1935, p. 1226, chap. 352, as amended.) That statute contains no direct definition of the term ''employee,'' but the cases have discussed this problem. Although some of the cases seem to have adopted an interpretation that goes beyond the common law definition of the term (*B. P. Schulberg Prod.* v. *California Emp. Com.*, 66 Cal.App.2d 831 [153 P.2d 404]; *California Emp. etc. Com.* v. *Sacramento etc. Assn.*, 68 Cal.App.2d 173 [156 P.2d 274]), the cases decided by the Supreme Court have adopted the rule

that the common law distinction between a servant and an independent contractor, namely, the distinction based upon the right of control, is the test under the act. The leading case on this subject is *Empire Star Mines Co.* v. *California Emp. Com.*, 28 Cal.2d 33 [168 P.2d 686]. At page 43 the court stated: ''The relationship contemplated by the legislation as the basis of the requirement for contributions is that of employer and employee; a principal for whom services are rendered by an independent contractor does not come within the scope of its provisions. [Citing cases.] In determining whether one who performs services for another is an employee or an independent contractor, the most important factor is the right to control the manner and means of accomplishing the result desired. If the employer has the authority to exercise complete control, whether or not that right is exercised with respect to all details, an employer-employee relationship exists. Strong evidence in support of an employment relationship is the right to discharge at will, without cause. [Citing cases.] Other factors to be taken into consideration are (a) whether or not the one performing services is engaged in a distinct occupation or business; (b) the kind of occupation, with reference to whether, in the locality, the work is usually done under the direction of the principal or by a specialist without supervision; (c) the skill required in the particular occupation; (d) whether the principal or the workman supplies the instrumentalities, tools, and the place of work for the person doing the work; (e) the length of time for which the services are to be performed; (f) the method of payment, whether by the time or by the job; (g) whether or not the work is a part of the regular business of the principal; and (h) whether or not the parties believe they are creating the relationship of employer-employee. (Rest., Agency, § 220; Cal.Ann. § 220.)'' (See, also, *Briggs* v. *California Emp. Com.*, 28 Cal.2d 50 [168 P.2d 696]; *Twentieth etc. Lites, Inc.* v. *California Dept. of Emp.*, 28 Cal.2d 56 [168 P.2d 699]; *California Emp. etc. Com.* v. *Lund,* 76 Cal.App.2d 567 [173 P.2d 379]; *Tomlin* v. *California Emp. Com.*, 30 Cal.2d 118 [180 P.2d 342].)

Several other legal principles should be mentioned. The motives of Bemis Enterprise in working out the challenged plan of operation are immaterial, the only question being whether there is or is not an employer-employee relationship. (*California Emp. etc. Com.* v. *Lund,* 76 Cal.App.2d 567 [173 P.2d 379].)

It is also the law that, generally speaking, the burden

of proof is on the party attacking the employment relationship (*Isenberg* v. *California Emp. Stab. Com.*, 30 Cal.2d 34 [180 P.2d 11]), or, at least, when a prima facie case of employment has been established, the burden shifts to the one claiming that the so-called employee was in fact an independent contractor. (*Robinson* v. *George*, 16 Cal.2d 238 [105 P.2d 914].)

■ The problem of whether a person is an employee or an independent contractor is primarily one of fact, but, where uniformity of decision is important, and the essential facts are not in conflict, the question may become one of law. (*Isenberg* v. *California Emp. Stab. Com.*, 30 Cal.2d 34 [180 P.2d 11].)

In the instant case all of the relevant evidence was introduced by stipulation. There is no conflict in the facts, but there is a conflict in the reasonable inferences that may be drawn from those facts. Certainly it is a permissible and reasonable inference that such contracts were carefully drawn by Bemis Enterprise so that it could maintain complete and almost absolute control over the operators of the restaurants. ■ The nature and provisions of the series of contracts, when considered together, are such that control by Bemis Enterprise seems to be the primary purpose and intent. The state, by such evidence, established a prima facie case of employment. This placed the burden of establishing an independent contractor relationship on Bemis Enterprise. This burden it could have met by showing that in actual practice no control was in fact exercised, and that the parties acted under the contracts and interpreted them so as not to give Bemis Enterprise the right of control. But no such evidence was offered. This being so, the finding of employment is supported.

Appellants consider each of the contracts and attempt to establish that that particular contract does not create an employer-employee relationship. They make their strongest argument in reference to the sublease. They point out that in *Empire Star Mines Co.* v. *California Emp. Com.*, 28 Cal.2d 33 [168 P.2d 686], the trial court held that a lease very similar to the sublease here involved did not create the employer-employee relationship, and that this holding was affirmed by the Supreme Court. While the lease there involved was quite similar to the sublease here involved, and in fact contained stronger provisions indicating an employment relationship than does the instant case, there are certain very important distinctions between the two cases.

The Empire case involved a leasing arrangement between a

mine owner and various miners to whom portions of the mine were leased. On its face the type of lease there executed appeared, even more clearly than the subleases here involved, to create an employer-employee relationship. In the Empire case, as in the instant case, rental was based upon a percentage of gross recovery, the leases were terminable by either party, and the lessees agreed to take care of the leased property and to mine the premises in a satisfactory manner. In addition, the lessees agreed to purchase explosives and fuses from the lessor at cost; the lessees agreed to discharge any of their workmen if the lessor's superintendent found them to be objectionable, although the lessor had no right to select lessees' workmen in the first instance; the lessor stored and shipped the bullion bars for each of the lessees separately and rendered accounts. Other provisions of the leases were very similar to those contained in the subleases here involved. Undoubtedly, the leases in the Empire case, standing alone, would have supported a finding of employment. But the leases did not stand alone. The type of contract there used, and the operations under such contracts, had a long history in the mining industry. The Supreme Court commented upon the fact that (p. 36): "Such contracts were an old practice in the Grass Valley Mining District, the custom having been brought over from Cornwall many years ago," and also pointed out that such leasing arrangements could not have been created to avoid the tax, because they long antedated the statute in question. In addition, there was evidence in the Empire case as to how the parties operated under and interpreted the leases. The trial court found, and the Supreme Court quoted the findings (p. 40), that, as a "matter of practice, the leasers at all times have been entirely independent from any supervision, direction or control by the plaintiff [mining company] of the method, manner or details of the leaser's operations in the leased areas"; that the provisions of the lease authorizing the lessor to enter the leased areas and "to inspect work done in both underground and milling operations . . . did not give the plaintiff [lessor] the right to direct or control the means or methods by which the leasers conduct their mining operations"; that those conditions were imposed to prevent ore stealing, to assure compliance with safety regulations; to assure the lessor that the lessees kept within the leasing boundaries, and to ascertain the direction of ore bodies uncovered; that the lessor "had no right to control, nor has it exercised any control, of the means, details or methods by which the

various lease groups conduct sorting and milling operations'';
that other provisions of the leases, as mutually interpreted
by the lessor and lessees were not construed as giving to the
lessor the control of, or the right to control, the details, man-
ner or methods by which the lessor conducted these operations.
The Supreme Court commented on these and other findings
at some length, pointed out that the state did not challenge the
sufficiency of the evidence to support these findings, and con-
cluded (p. 45): ''The testimony concerning the conduct of
the parties directly negatives an employment relationship,
and taken as a whole, the evidence substantially, if not con-
clusively, supports the determination of the trial court that
the leasers were independent contractors.''

These factors serve to distinguish the Empire case from the
instant one. Here the trial court has found that the sub
and equipment leases were not bona fide; that the trust, ac-
counting and service agreements, furnished by Bemis Enter-
prise, were ''in intent and effect, designed to apply the con-
trol in the plaintiffs [Bemis Enterprise] over the said White
Log Coffee Shops employee's personnel.'' There was but
little evidence contained in the various stipulations as to ac-
tual operations under the contracts, but what evidence ap-
pears supports the inference that Bemis Enterprise, under the
contracts, not only could but did exercise control. While it
is true that Bemis Enterprise was not a party to the partner-
ship agreements, it furnished the forms in all cases where more
than one person became the subtenant, and, in all such cases,
partnership agreements on these forms were executed. The
evidence shows no substantial capital contribution of any of
these ''partners.'' While there was no contractual provision
compelling the subtenants to enter into the trust, accounting
and service agreements, every subtenant did enter into them.
The inference is clear that this was done pursuant to an im-
plied understanding between the parties. Although the stip-
ulations do not state that Hazlett, the trustee, and Hornstein,
the accountant, were members of Bemis Enterprise, the infer-
ence, from their background and source of income, is clear
that they were controlled by and part and parcel of that or-
ganization. Thus, Bemis Enterprise maintained complete con-
trol over the form and methods of accounting, and control
over the gross receipts, even having such receipts banked in the
name of the trustee. Although under the sublease and the
service agreement only ''suggestions'' could be made by Bemis
Enterprise as to the details of operation, and although the

stipulations of fact do not affirmatively state that control was exercised, it being stated that the service men "visited," "observed," "discussed," "suggested," "assisted," "demonstrated," "commented," "inspected," "gave impressions" and the like, it is quite apparent that the inference that the service men, in fact, exercised control over the most minute details of the operations of the coffee shop, is amply supported. They visited each location at least once a day and often twice a day; they "commented" on the conditions they saw and "recommended" how food should be prepared and served, and seasoned, etc., etc. Moreover, it was stipulated that these service men produced new partners and employees, frequently without any request therefor. While the contracts, and the stipulated facts, do not, in so many words, state that Bemis Enterprise had the right to control the operations of the sublessees, the activity and control by Bemis Enterprise of the service organization, its prior and present connections with Hazlett and Hornstein, and the other factors already mentioned, raise more than a mere suspicion that the whole arrangement was conceived by Bemis Enterprise as a method of completely controlling its sublessees while giving the appearance that such sublessees were independent contractors. The record supports a reasonable inference that this was so. It is not form but substance that must control. The whole arrangement is impregnated with factors of control. The record and the reasonable inferences therefrom fully support the finding that these sublessees were the employees of Bemis Enterprise. That organization knew how the parties operated under the contracts and how they interpreted them. If Bemis Enterprise had not in fact controlled the subtenants, it is reasonable to suppose that such evidence would have been produced. No such evidence to rebut the prima facie case established by the state was introduced. This being so, it must be held that the findings are supported. (See, generally, *Tomlin* v. *California Emp. Com.*, 30 Cal.2d 118 [180 P.2d 342]; *Twentieth etc. Lites, Inc.* v. *California Dept. of Emp.*, 28 Cal.2d 56 [168 P.2d 699].)

The judgments appealed from are affirmed.

Bray, J., and Wood (Fred B.), J., concurred.

Appellants' petition for a hearing by the Supreme Court was denied April 14, 1952. Schauer, J., and Spence, J., were of the opinion that the petition should be granted.